## The Minnie.

## The Doris.

GEDNEY and others *v.* THE MINNIE and another.

*(Circuit Court, D. Connecticut. June 24, 1887.)*

ADMIRALTY—TOW AND STEAMER PASSING IN NARROW CHANNEL—NEGLIGENCE.
While the steam-tug M., with two barges, made fast on each side, was passing through the north channel, between the Sunken Meadows and the Middle Ground, beyond Hell Gate, the steamer D. passed on the starboard side at full speed, and caused the M. and her tow to sheer so that the outside barge on the port side ran upon the rocks of the Sunken Meadows, and was sunk. The channel is between 300 and 400 feet wide. The M., on entering, chose a course close to the Sunken Meadows, and was making less than three miles through the water. The D., then about 500 feet astern, blew one whistle, indicating she proposed to pass the tow on the starboard side, to which the M. made no reply. The D. continued her course, making about 10 miles through the water, and passed within 25 feet of the M., on the starboard side. The M. sheered to port, and, although the helms of the tug and barges were ported, she was unable to keep the outside barge off the rocks. *Held*, that the M. was in fault in choosing a course so close to the Sunken Meadows as to be unsafe, and in not answering the signal of the D. in protest of her passing in the channel as proposed; and that the D. was in fault in passing the M. in a narrow channel at a high rate of speed, or in not waiting until the M. had got out of the channel; also that, as between the vessels and their stipulators, each must pay one-half of the amounts due the respective libelant and co-libelants, and, in case of default on the part of either vessel or her stipulators in the payment of her half, the deficiency must be made up by the other vessel and her stipulators.

Findings of Fact and Conclusions of Law by the Circuit Court.

FINDINGS OF FACT.

WALLACE, J.   *First.* On the ninth of March, 1883, the steam-tug Minnie took the barge H. S. Van Santvoord, with three other barges, in tow, to take them from New York to New London, Connecticut.   The barges were made fast along-side the Minnie, two on the port side and two on the starboard side.   The H. S. Van Santvoord was the outside boat on the port side.   She was a large barge, 130 feet in length, 38 feet in width, and had a draught, as loaded, of not over 9 feet.   The other barges were about the same size.   The Minnie was a steam-tug about 115 feet in length and about 20 feet beam.

*Second.* The tug, with her tow, proceeded up the East river, and through Hell Gate.   From there the course of the tug and tow lay past Randall's island, between the Sunken Meadows and the Middle Ground, where the channel is between 300 and 400 feet wide.   This is the North channel. South of the Middle Ground is another channel of about the same width. The Middle Ground is a narrow shoal, dividing the two channels, and about a quarter of a mile long.

*Third.* The Minnie, on entering the North channel, chose a course close to the Sunken Meadows.   She, with her tow, was making less than three miles an hour through the water, and about six miles an hour by the land, as she was running with the flood-tide.   About the time the Minnie entered the North channel the steamer Doris, which was about 500 feet astern of her, blew one whistle, indicating that she proposed to pass the tow on the starboard side.   The tug made no change in her course, and made no reply to the whistle of the Doris.

*Fourth.* The Doris was a steam-propeller of 1,096 tons.   Her length was 236 feet, her beam 32 feet, and her draught between 12 and 14 feet. She was bound from New York to Providence, Rhode Island, running at full speed, making 10 miles through the water, and about 14 miles by the land.   After signaling the Minnie, though without receiving a reply to her signal, she continued at full speed, and overtook the tug and tow in the North channel, passing within 25 feet of the starboard side of the tug.   The passage of the Doris, so close to the tug and tow, drew the stern of the tow to starboard, throwing the head of the tow to port, giving the tow a strong sheer towards the Sunken Meadows.   This is the ordinary effect of a vessel, of the size and speed of the Doris, passing another in such close proximity.   To meet this influence, the master of the Minnie put his helm to port, and ordered the helms of the barges to be ported.   The orders were promptly executed, but they were ineffective to break the sheer which the tow had taken, and the bow of the H. S. Van Santvoord struck upon the rocks of the Sunken Meadows, which were close upon her port side.   The wheel of the Minnie was not put to starboard as charged in the libel.

*Fifth.* The bottom of the barge was raked by the rocks for a distance of 20 feet, and she filled with water, and sank, sliding off into the channel, where the depth of water was 90 feet.   At the time of sinking she had a cargo of 605 tons of coal, which was being carried on freight.

*Sixth.* The Doris made no change in her course or speed after signal-

ing the Minnie. The channel to the south of the Middle Ground was open, and the Doris could have used that. It was about the same width as the channel to the north of the Middle Ground, and the depth of water in it was 60 feet.

*Seventh.* The Doris could have passed the Minnie in the North channel at a greater distance than that at which she did pass, and at a distance that would have been reasonably safe.

*Eighth.* If the Doris had checked her speed until the Minnie had passed through the channel, both vessels would, in the course of two minutes, have run into wide water to the eastward of the Middle Ground, where there would have been ample room for the Doris to pass the tow at such distance that her speed would not have affected the Minnie. The course taken by the master of the Minnie was too close to the Sunken Meadows to be safe, but, after the Doris had entered the North channel, the Minnie could not get away from the Sunken Meadows without throwing herself across the course of the Doris.

*Ninth.* If the Doris had passed the Minnie at a lower rate of speed, her influence upon the tow could not have been so great, and the influence might have been overcome by the helm of the tug and tow.

*Tenth.* The barge and her cargo was subsequently raised and brought to New York, where the cargo was sold. A survey of the barge was held, and repairs were recommended. The libelants George W. Gedney, and Anna H. Post, administratrix, were the owners of the barge. They lost the furniture of the barge, and the use of her for a considerable period, and the freight pending on the voyage. The value of the furniture was $100; the use of the barge during the period which would be occupied in the necessary repairs was $210, and the net freight which they would have earned by the completion of the voyage was $160. The expense of raising the barge was $1,155. It was necessary to dock the vessel in order that it might be determined what repairs were necessary, and also to make certain temporary repairs to keep her from sinking when she left the dock. These expenses, with the expenses of towing and of recovering certain pieces of wreckage, amounted to $352.55. It would have cost $7,500 to repair such damages to the barge as were caused by the disaster. In fact, the owners of the barge expended $10,147.91 in repairing and refitting her, but in doing so they made certain improvements for which no recovery can be had in this action.

*Eleventh.* The barge was insured in the Phœnix Insurance Company and the Western Assurance Company of Toronto. These companies paid the cost of raising the barge, and the cost of temporary repairs as above found, and further paid the sum of $7,500, the estimated costs of repairs to the hull. The entire payments on the part of the Phœnix Insurance Company and the Western Assurance Company of Toronto, on account of the hull, amounted to $9,022.54, one-half of which was paid by each company. The cargo of coal was insured in the Phœnix for its value of $2,700, and they paid that amount to the owners of the coal as a total loss. They sold such of the coal as was recovered, and

the net salvage thereon amounted to $631..57, making the net loss of the Phœnix Insurance Company on account of the cargo, $2,068.43.

*Twelfth.* The libelant Theron B. Post lost his clothing to the value of $103.70. The libelant Henry Post lost his clothing to the value of $77.54, and the co-libelant James Gallagher, lost his clothing to the value of $33.97.

### CONCLUSIONS OF LAW.

*First.* The disaster was due to the fault of both the Minnie and the Doris.

*Second.* The Minnie was in fault in choosing a course so close to the Sunken Meadows as to be unsafe.

*Third.* She was further in fault in not answering the signal of the Doris in protest of the Doris passing her as proposed.

*Fourth.* The Doris was in fault in that, on receiving no reply from the Minnie, she did not check her speed, and refrain from passing the Minnie until they had reached wider water. She was also in fault in that she did pass the Minnie at a high rate of speed, in a narrow channel; could have waited until the Minnie had got out of the North channel; or could have passed at a lower rate of speed.

*Fifth.* The libelants and co-libelants should recover the sum of $12,-661.19, with interest thereon from May 1, 1883, and the further sum of $448.78, their costs as taxed in the district court, and their costs in this court to be taxed, the recovery to be apportioned as provided in the decree of the district court, making due allowance for interest and costs.

*Sixth.* As between the Minnie and the Doris, and their respective stipulators, each vessel and her stipulators must pay one-half of the amounts due to the respective libelants and co-libelants; and, if there is a default on the part of either vessel or her stipulators in the payment of her half of said amounts, the deficiency must be made up by the other vessel and her stipulators.