### THE MESABA.

### THE MARTELLO.

#### (District Court, S. D. New York. June 12, 1901.)

1. COLLISION—OVERTAKING STEAM VESSELS—UNANSWERED SIGNAL.

Under article 18, rule 8, of the inland navigation rules, when an overtaking steam vessel signals her desire to pass it is the duty of the vessel ahead to answer the signal at once, and the overtaking vessel is prohibited from attempting to pass, where it is not clearly safe and the co-operation of the vessel ahead is required, unless she receives an assenting answer to her signal. Where both vessels violate these requirements, the overtaking vessel mistaking the silence of the other for acquiescence in her signal, and in attempting to pass at a bend in a channel a collision occurs, both are in fault; and neither is relieved from liability by the fact that her violation of the rule was not the sole cause of collision, and that the passage would have been safely made but for the improper navigation of the other.

2. SAME—RESPONSIBILITY OF OVERTAKING VESSEL.

An overtaking vessel takes whatever risks attend her attempt to pass, from whatever cause arising, except from the fault of the vessel ahead, which is bound only to keep her course and speed.

3. SAME—VESSEL OVERTAKEN—RULE AS TO COURSE AND SPEED.

Where at the time an overtaking vessel signaled her intention to pass the vessel ahead, the latter had stopped her engines to permit a schooner to cross her bows, which purpose was obvious to the overtaking vessel, the resumption of her former course and speed after the temporary purpose of her stopping has been accomplished can hardly be charged as a violation of the rule requiring her to keep her course and speed.

4. SAME—EFFECT OF SUCTION.

The suction caused by a moving vessel, and its lateral effect upon another vessel, depend upon a number of circumstances, of which the

most important are the size and speed of the two vessels, and particularly the depth of water beneath them, and the mass and extent of the water on each side; the force being at its maximum and operative for a considerable distance where the water is shallow or confined.

**5. SAME—TOO CLOSE APPROACH—SUCTION.**

A large steamer, 482 feet long, and drawing 29 feet, and going at a speed of 12½ knots an hour at the time she overtakes another vessel of nearly the same size and draft, is not justified in passing at a distance of not more than 150 feet at a place where the water is little deeper than their keels; and a collision occurring under such circumstances by the swinging of the bow of the overtaken vessel against the quarter of the one passing may reasonably be attributed to the effect of suction, in the absence of other apparent cause.

In Admiralty. Libel and cross libel for collision.

Convers & Kirlin, for the Mesaba.

Wing, Putnam & Burlingham, for the Martello.

BROWN, District Judge. At 10:32 a. m. of September 22, 1900, the steamships Martello and Mesaba, both outward bound from this port, came in collision not far from the western entrance of Gedney channel, by which both vessels sustained damages, for which the above libel and cross libel were filed.

The Mesaba is 482 feet long, 52 feet beam, 31 feet in depth, of 4,423 net tonnage and drew at that time 29½ feet aft. The Martello is 370 feet long, 43 feet beam, 28 feet deep, of 2,439 net tonnage and was drawing at that time 27¾ feet aft. The Mesaba's full speed at sea was 15 knots, the Martello's 12 knots. But at this time under a less head of steam, and according to the revolutions of the propeller then making, the Mesaba's full speed through the water was about 13 knots, and the Martello's, 10 knots. To this 1 knot should be added for the moderate west wind and the ebb tide running S. E. at about 1¾ knots. Both vessels went down the bay through the Main channel and around the southwest spit. The Martello passed Sandy Hook beacon abeam of her bridge at 10:28; the Mesaba, at 10:30, the Martello being then about one-third of a mile ahead. The Mesaba subsequently after a passing signal of two whistles, put her engines at full speed ahead and overhauled the Martello by going to port. In passing her on her port or northerly side, not far from the black buoy E. 7, which with the opposite red buoy E. 8 marks the western end of Gedney channel, when the Martello's stem was about abeam of the Mesaba's midships or a little more aft, the Martello's bow was seen to turn to port towards the Mesaba, and it continued to turn more rapidly as the Mesaba advanced until the bluff of her port bow, about 20 feet from her stem, struck the starboard quarter of the Mesaba about 100 feet forward of the Mesaba's stern a violent blow, which broke a number of the Martello's iron plates and damaged her stem so that she was obliged to return to New York. The Mesaba sustained less injuries, and was able to continue her voyage. The faults charged against the Mesaba are

(1) Too great speed; (2) too close approach to the Martello in passing her; (3) attempting to pass at a dangerous place while on the turn from the Main channel into Gedney channel; (4) crowd-

ing the Martello closely towards the starboard side of the channel, instead of keeping further to the northward; (5) not waiting for the Martello's assent to her passing signal.

The faults charged by the Mesaba against the Martello are (a) failure to keep on the starboard side of midchannel; (b) crowding unnecessarily to the northward; (c) failure to reply to the Mesaba's overtaking signal; (d) failure to keep her course and speed.

It is contended for the Martello that the actual point of collision was a little to the eastward of buoy E. No. 7; for the Mesaba, that the collision was to the westward of that buoy and before the Mesaba had made any turn to enter Gedney channel. The regulation overtaking signal of two blasts of the steam whistle was given by the Mesaba when she was at a distance variously estimated from one or two lengths to a quarter of a mile astern of the Martello and upon the same general course, but a little more to the northward, and having the Martello a trifle on her starboard hand. It is admitted that no answer was returned by the Martello to this signal, for the reason, as claimed by the latter, that it was not safe for the Mesaba to pass at the turn into Gedney channel, and because her pilot had no idea that the Mesaba would attempt to pass the Martello until after that turn was completed.

The change of course from the Bayside channel into Gedney is $2\frac{3}{4}$ points to the southward, the compass course as laid down upon the chart from the southwest spit to the western entrance of Gedney being E. by N., and from that point through Gedney channel E. S. E. $\frac{1}{4}$ E. Through Gedney channel the breadth of available water, as laid down upon the chart, between the line of black buoys on the south and of the red buoys opposite on the north, is about 1,000 feet; and through the Main or Bayside channel, leading to Gedney channel, the breadth is about the same.

For the Mesaba it is urged that the space was sufficient for safely overtaking and passing even on the turn; that she went at a safe distance and without porting at all up to the time of collision, and that the collision was brought about by the starboarding of the Martello. The Martello contends that the collision was brought about by the Mesaba's too close approach in passing, by her porting her helm and by the powerful suction of the after part of the Mesaba as she passed the Martello at high speed, which it is said irresistibly drew upon her quarter the Martello's bow, despite all that the latter could do by a hard a-port wheel to check its influence; and that she did not starboard at any time, but ported to make the turn into Gedney when the Mesaba's bow lapped her port quarter about 30 feet.

1. The testimony as to the place of collision, whether at the entrance of Gedney channel or to the eastward or westward of that point, is very conflicting; the same witnesses at different times making inconsistent statements. This may be partly explained by the confusion in the recollection of the witnesses resulting from the fact that the Martello's bow upon collision clung fast to the Mesaba's quarter so that the vessels remained together for four or five minutes until they had nearly passed through Gedney channel, when the Martello cleared and passed to the southward between the outer Gedney buoys.

The times noted on each vessel when Sandy Hook beacon was abeam of the bridge, viz. 10:28 and 10:30 respectively by the deck logs, the time of collision, 10:42, and the speed of the vessels as given by the revolutions, with the other known data, are sufficient to compute quite approximately the place of collision as well as the intermediate positions at different times. The Martello passed Sandy Hook at full speed (11 knots with tide), but in order to allow a schooner going to the southward in the Swash channel to cross ahead of her, slowed at 10:30 by the engine room log, stopped her engines at 10:31, remained stopped for two minutes and at 10:33 again put her engines at full speed. During this interval her headway was much deadened, and she could have obtained her full headway again only shortly before she reversed, not over a minute before collision. This reversal was at 10:39 by the same engine room log, and the collision being at 10:40 by that time, or two minutes slower than the deck time, two minutes must be added to the above times of her slowing and stopping for the purpose of comparison with the Mesaba. This is further confirmed by the fact that the distance from Sandy Hook beacon to the middle of the Swash crossing is so great (8,800 feet) that the Martello would not slow for a schooner crossing in the Swash at less than half that distance from the crossing, which at 11 knots speed is 4 minutes time from Sandy Hook. Moreover, if the time of the deck and engine room had been the same, the Martello would have traversed the distance to the point of collision in 12 minutes, the same time occupied by the Mesaba; so that the Mesaba would not have overtaken her at all.

The Mesaba, previously going "slow" (7½ knots with tide), when passing Sandy Hook at 10:30 put her engines at "half speed," i. e. about two-thirds of "full speed," or 9⅔ knots with tide, and so continued until soon after signaling to the Martello that she would pass her. She then starboarded her helm and put her engines at "full speed" (14 knots with tide), and this was continued until collision at 10:42, 12 minutes after passing Sandy Hook, and afterwards till the vessels separated. Full speed headway, however, could not be acquired by the Mesaba or Martello in less than from 3 to 5 minutes after the order "full speed."

The distance from Sandy Hook beacon to Gedney entrance between buoy E. 7 and E. 8 is 13,600 feet, almost exactly 2¼ nautical miles; to the buoys next west, B. 1 and the cage buoy B. 2 opposite, 10,800 feet; to buoy B. 3, where the pilot of the Mesaba says he signaled, 6,300 feet. From buoy B. 3 to the Swash is 2,500 feet; thence to E. 7, 4,800 feet.

From the distance from Sandy Hook to E. 7 (13,600 feet) it is evident that the Mesaba could not have reached Gedney channel in 12 minutes, except by going at somewhat above 12 knots speed during the whole time, whereas she was going slow (7½ knots with tide) off Sandy Hook, and at only "half speed" of her engines (9⅔ knots with tide) for the next 5 to 6 minutes; so that the place of collision must have been somewhat to the westward of the entrance to Gedney.

Upon computation from the data above stated, appear the following approximate results:

(a) That when the Mesaba's bridge was abreast of the Sandy Hook beacon, the bridge of the Martello (2 minutes in advance) would be about 2,222 feet ahead of the Mesaba's bridge; the Martello during the next two minutes gained about 475 feet, so that her stern was then ahead of the Mesaba's bow about 2,300 feet, the Martello's bow being then about 4,600 feet from the beacon and about 4,200 feet from the middle of the Swash channel crossing; (b) at 10:32 the Martello slowed and at 10:33 stopped her engines for 2 minutes; during this three minutes up to 10:35 she dropped her speed to about 4½ knots, traveling in that time about 2,200 feet; and the Mesaba, then going at 9¾ knots (half speed) gained upon her during that time about 750 feet, making her bow then about 1,550 feet behind the Martello's stern, which was then about 150 feet to the eastward of buoy B. 3, when full speed was ordered by the Martello; (c) within a minute afterward the Mesaba gave her signal of two whistles, and very soon after gave the order "full speed"; and at collision at 10:42 the Mesaba's bow was about 600 feet west of the entrance of Gedney, and the Martello's about 950 feet.

Nearly all the testimony agrees that at the Mesaba's signal of two whistles, she was a quarter of a mile astern of the Martello. My computation is the same. At their respective speeds, it was impossible for the Mesaba to make the subsequent gain she did make up to collision (about 2,250 feet) in less than from 5 to 6 minutes. When she put on full speed shortly after signaling, she must therefore have been in the vicinity of buoy B. 3, as her pilot Butler testifies, and this was therefore within a minute after the Martello ordered full speed, after waiting for the schooner to cross ahead of her.

The computed rate of full speed is from 1½ to 2 knots greater than the estimate given by the officers of both vessels. But if a reduction to their estimates were made, the place of collision must necessarily be brought from 600 to 800 feet more to the westward than I have computed it. On account of the drag on the vessels while in shallow water but a few feet deeper than their keels, I have reckoned full speed in such places at 13½ and 10¾ knots instead of 14 and 11 respectively.

The above computation made upon data about which there is little doubt or difference, agrees with much of the testimony, and serves to correct many evident mistakes. The two pilots, the captains, and even Chief Officer Rayward at last agree that the collision was to the westward of E. 7 "on the turn into Gedney." Both the pilots in their reports made at the time so stated. This turn, which might possibly be made in three lengths under a hard a-port wheel, is usually made more slowly with helm not hard a-port, as the pilot testifies; so that the turn would usually occupy from 1,500 to 2,000 feet before reaching Gedney, though a part of it might probably be made in Gedney channel itself.

Upon the whole evidence, therefore, I find that the collision took place when the Martello's bow was from 300 to 400 yards to the westward of the black buoy E. 7, while both vessels were making the turn into Gedney channel, although the Mesaba may not have had any express order to port, as she was steered partly by the buoys; that the Mesaba had signaled her intention to pass the Mar-

tello from 5 to 6 minutes previously, when more than a mile to the westward of the point of collision and at least a quarter of a mile astern of the Martello; and that the Mesaba's stem overtook the stern of the Martello when about half a mile to the westward of E. 7, or a little west of buoy B. 1. As the Mesaba gained 720 feet on the Martello from the time the latter ported (when overlapped 30 feet) up to collision, the computation shows that that gain would take 1¾ minutes, which agrees with the testimony; and that during that time the Martello advanced about 1,660 feet, and the Mesaba about 2,380 feet; so that the Martello must have ported when she was about 2,700 feet west of Gedney, i. e. when about abreast of black buoy B. 1.

It is very probable that the pilot of the Mesaba noticing his rapid gain upon the Martello during the three minutes when she slackened her speed to let the schooner pass ahead of her, supposed that by signaling and going at full speed he could pass the Martello before it was necessary to begin the turn into Gedney channel. That turn could easily be completely made by the Mesaba within the space of 500 yards before reaching the entrance, and at the moderate speed the Martello was then making he would pass her long before he would need to begin the turn. I find it difficult, however, to credit the pilot's statement that he supposed the Martello was stopping to allow him to pass her. If he had observed the schooner he ought to have understood that the Martello's stop was probably to let the schooner pass ahead. The schooner was noticed by Paul, the chief officer of the Mesaba, on the deck below, though no report of her was made; but if the pilot did not notice her, that is a poor excuse for his erroneous supposition. He ought to have understood that the Martello would naturally increase her speed, although he might not know to what rate; and very soon after he gave the full speed order, he must have seen that the Martello was increasing her own speed.

The circumstances, however, were such as made it peculiarly incumbent on the Martello to answer the Mesaba's overtaking signal. For when this signal was given, although it was after the Martello's engines had been again put at full speed, her way had been so much deadened by her previous stop of three minutes, that the Mesaba was very rapidly gaining on her, as the Martello's pilot says; and the pilot of the Mesaba could not know at what speed the Martello was going, or how quickly she would gain, or would seek to regain, her full headway. It was necessarily uncertain, therefore, just when or where the Mesaba would overtake and fully pass the Martello, whether before reaching the necessary turn into Gedney channel or not. This depended on the conduct and speed of the Martello; and the Martello therefore plainly ought to have answered the Mesaba's signal. Her failure to answer, it is said, led the Mesaba to suppose that the Martello did not dissent, and would do nothing to embarrass the Mesaba in passing. Under the language of article 18, rule 8, of the inland rules of navigation, the pilot had perhaps no right to draw that inference, but it was not a wholly unnatural inference.

It is evident from the testimony of most of the witnesses that it is undesirable for one steamer to attempt to pass another while on the turn into Gedney channel. Passing should either be accomplished before the turn is begun, or postponed until the turn is passed and each is again straightened upon her course. From the width of the channel, however, viz. about 1,000 feet, I do not doubt that passing may be accomplished safely even on the turn, provided that there is a perfect understanding between the vessels, and concert of action to avoid danger; but not otherwise. When there are no other vessels in the way, coming in or going out, if the vessel ahead keeps well on the starboard side of the channel, the other by going on the port side can keep four or five hundred feet of space between the vessels, while each would be 200 feet from the buoys on the south or north. I do not doubt, however, that the Mesaba expected to pass the Martello before porting to enter Gedney channel, as it is not necessary to commence porting more than 1,000 feet to the westward of the entrance, though it is usual to port earlier.

The rule as respects passing, then and now in force, is as follows:

Article 18, rule 8. When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam whistle, as a signal of such desire, and if the vessel ahead answers with one blast, she shall put her helm to port;

Or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall put her helm to starboard;

Or if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam whistle, not less than four, and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done, when said vessel ahead shall signify her willingness by blowing the proper signals.

The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel. 2 Supp. Rev. St. p. 638.

Although the critical reading of this rule may discover some ambiguities or incompleteness in its phraseology, its very plain intention, as it seems to me, is (a) that the vessel ahead shall always answer an overtaking vessel that signals her desire to pass; and (b) that unless in a clearly safe place for passing the overtaking vessel shall not pass unless, nor until, an assenting signal is given. The language is very specific, that if the vessel ahead "shall not think it safe for the vessel astern to attempt to pass at that point," she shall immediately signify the same by giving not less than four short and rapid blasts of the whistle; and the meaning of the subsequent clause is, that under no circumstances shall the vessel astern attempt to pass except in a safe place, nor until after the vessel ahead has given an assenting signal promising co-operation, if needed, so that passing "can be safely done."

The witnesses from the Martello say that attempting to pass at that time, which the Martello foresaw would occur on the turn, was regarded as dangerous; so much so that they did not think the

Mesaba, notwithstanding her signal, would attempt to pass until both vessels had got straightened out in Gedney channel. But this excuse for not answering at all cannot possibly be accepted as valid in face of the positive requirement of the rule that in such a case a dissenting signal shall be given; still less when it was the great increase of the Martello's speed that brought the passing to the turn, the point of danger. The rule says the dissent shall be sounded *immediately*, if it is not thought safe "to pass at that point," i. e. by proceeding to pass at once; not sounded at some future time or place. Nor can the excuse be accepted even as a fact, since the Mesaba was plainly to be seen overhauling the Martello, and continuing to approach nearer and nearer without any abatement of speed for three or four minutes before the Martello ported, so that the Martello must have seen that the Mesaba was intending to pass at once, in accordance with her signal; and still no dissent was given.

When the Martello ported she had regained, according to the pilot's testimony, very nearly her full speed, thus delaying the Mesaba in passing much longer than was anticipated. The Martello, by failing to give the dissenting whistles that the statute required, seemed to acquiesce in the Mesaba's proposal, while she at the same time increased and prolonged the difficulties of passing by increasing her own speed to the utmost, and thereby bringing the vessels to the point of danger, until perhaps a minute and a half before collision, or a little less, when she slowed and reversed. The pilot of the Mesaba testifies that had he received any dissenting whistles, he should not have attempted to pass. I see no reason to doubt this testimony. I think the conduct of the Martello was calculated to mislead the Mesaba and to some extent did so; particularly in view of the common but blamable practice of pilots to omit signals which they think unnecessary, though required by the rules; and as failure to answer was in direct violation of the positive requirement of the rules of navigation, the Martello must be held in part to blame for the collision.

2. But the Mesaba is certainly no less in fault for the disregard of rule 8. Though not wholly free from ambiguity, its plain intent seems to be, as above stated, wherever the place is not clearly safe, or requires co-operation, as in this case, to prohibit the vessel astern from passing until she receives an assenting signal, and making it the duty of the vessel ahead to signal her dissent at once, if an immediate attempt to pass is deemed unsafe, and thereafter to give an assenting signal as soon as a safe place for passing is reached; so that the overtaking vessel in such situations shall never attempt to pass until the assent is given. However natural, therefore the Mesaba's interpretation of the Martello's failure to answer may have been, as an acquiescence in his proposal, he was not in this case justified under the express prohibition of the rule in going on; and for this disobedience of the rule the Mesaba is equally to blame with the Martello.

It is not a sufficient answer to say that the omission to signal did not cause the collision. It indeed was not the only cause, but it was

one of the contributing causes, inasmuch as obedience to the rule on either side would undoubtedly have led to an avoidance of the collision. The precise object of the rule was to prevent any such collisions as this and to dispense with the necessity of inquiry into the immediate causes of them, often with most unsatisfactory results, by making it a positive obligation on the one side to answer the signal, either by assent or dissent; and on the other side, not to attempt to pass in a place of doubtful safety without a signal of assent. Both vessels disobeyed the rule, and a collision resulted, in which almost every other cause that can be invoked to account for the collision is involved in conflict, obscurity and doubt. The court is not called on to attempt to resolve these doubts, and to attempt to decide the cause on independent grounds, since whatever might be determined in regard to them would not alter the fact of the disregard of this rule by both vessels and their consequent joint liability. The New York, 175 U. S. 187, 205–207, 20 Sup. Ct. 67, 44 L. Ed. 126; Id. (D. C.) 53 Fed. 553, 558; The Garden City (D. C.) 19 Fed. 529, 533; The Nereus (D. C.) 23 Fed. 448, 451–454; The Minnie (D. C.) 20 Fed. 543, affirmed in 31 Fed. 301.

The case in other aspects, however, is so interesting, and has been so carefully presented by counsel that I add a few observations on some other points.

The Mesaba as an overtaking vessel was bound to keep out of the way of the Martello (article 24), and took whatever risks attended the attempt to pass where she did, whether arising from the narrowness of the channel, the shallowness of the water, suction, the tide, or any other causes except those arising from the fault of the Martello herself; the latter was bound to keep her course and speed. Article 21.

In the Mesaba's log entries and in some of her testimony, the collision is ascribed to the Martello's starboarding her wheel when the Mesaba had come abreast of her. A similar claim was made in the case of The Aurania and The Republic (D. C.) 29 Fed. 98, 119–121, in a collision near the same place as this. I was satisfied in that case that there had not been any such mistaken change of the wheel. And in the present case I do not think this change is on the whole sufficiently proved; although the very unsatisfactory evidence as to the course and steering of the Martello makes it not impossible. The pilot and the officers of the Martello say that the Martello's wheel was not starboarded at all, but was ported, when the Mesaba's stem had lapped her stern about 30 feet, and was thereafter kept hard a-port. No doubt the helm was ported about that time; but it certainly was not at once put and kept hard a-port, as several of her witnesses state; for if it had been, the Martello, being then from 800 to 900 yards from buoy E. 7, would have gone to the southward of Gedney channel before reaching it. The pilot admits that the helm was not put hard a-port at once, and the fact that up to a few moments only before collision, when her stem suddenly swung to port towards the Mesaba, she had turned her stem to starboard under her port wheel only about two points, while advancing about 500 yards and reversing about one-half of a minute, is conclusive proof that her wheel was at first but slightly ported, and that she was mak-

ing a very gentle turn. If, as is quite probable, the immediate normal action of the port helm was retarded by the bow wave of the Mesaba as she advanced upon the port quarter of the Martello, all this retarding action would be offset by the opposite and accelerating influence of the same bow wave as the Mesaba advanced beyond the Martello's midships and reached her port bow.

In fact, nothing except uncertainty can be deduced from the testimony as to the mode of steering either vessel. The chief officer on each states that his vessel was steered mostly by the buoys, not by compass. The pilots' testimony is different. The pilot of the Martello says that his course was E. by N., and that the tide though running S. E. did not affect him "enough to make any change of course whatever." The pilot of the Mesaba says that he starboarded a quarter of a point to the northward "until he got the Mesaba where he wanted her," and then steadied to E. by N. again, and was on that course when he lapped the Martello. This is most unsatisfactory; for both say that the tide was running about S. E. and, being in the last quarter of the ebb, at about 1¾ knots; and such a tide crossing the vessels' courses of E. by N. at an angle of nearly five points would set the Martello to the southward at the rate of at least 140 feet to every 1,000 feet of her advance, even when she was at her full speed; and it would set the Mesaba the same distance to the southward for every 1,300 feet advance at her full speed. To offset this would require a constant heading of from two-thirds to three-fourths of a point to the northward of N. by E., or else such fluctuations and changes of the helm from time to time as should be equivalent to that; and without either one or the other, if the direction of the tide is truly stated, the Martello, if headed E. by N. must have gone to the southward of E. 7 outside of Gedney channel. If on the contrary the vessels were steered by the buoys, this might easily be attended with fluctuations and unsteadiness of course. And if from any cause after first porting the Martello on approaching E. 7 got very near the southerly line of the Bayside channel, she would have been compelled to starboard to avoid getting aground. I think, however, that she did not get into that situation, but kept up more to the northward towards midchannel.

As respects the place of collision, whether on the north or south side of midchannel, and which vessel, if either, crowded the other, the testimony is equally conflicting. All the witnesses for the Mesaba say that she was in the northern half of the Bayside channel; her pilot says he was 600 feet to the northward of E. 7. Most of the witnesses for the Martello claim that the collision was near the southerly buoys. The pilot of the Martello says that while stopping to let the schooner pass down the Swash channel, the Martello sagged somewhat towards the southerly buoys, and the pilot of the Mesaba places the Martello then within 60 feet of them. But the course subsequently traced carries the Martello towards midchannel in Gedney, and her master in very carefully indicating on the chart the place of collision, places her very near midchannel to the westward of Gedney; and in his testimony he describes the Martello as only a "little to the southward of midchannel," though he also inconsistently gives a distance in feet much nearer to the southerly buoys.

The force of the blow of collision was such as to send the Mesaba's stern somewhat to the northward, as much as was needed, according to her testimony, to make the proper turn into Gedney, and a little more; so that after collision the vessels were turned a little towards the southerly buoys in Gedney channel, and after proceeding for several minutes clinging together, the Martello on getting clear went to the southward of Gedney between the two outer black buoys, as above stated. This testimony from both sides indicates that at collision the Martello was only a little southerly of midchannel, as the master says, since otherwise, on getting turned towards the buoys, with that and the tide, the Martello would have been carried south of Gedney much sooner. I think the collision was not caused by the crowding of either vessel towards the buoys.

The charge against the Martello that she did not keep her course and speed in accordance with the requirement of article 21, when she knew that the Mesaba was overtaking her, is undoubtedly true as a literal fact; but the application of the rule to the situation in such a way as to constitute fault, is I think doubtful. The pilot of the Mesaba testifies that when he whistled, signifying his desire to pass the Martello, and even when he gave the order "full speed," the Martello's engines were stopped, because he looked and saw no motion of the water at her wheel. But the testimony from the Martello is that the whistles were heard after the Martello had given the order full speed ahead, and my computations agree with that.

The pilot says that when he started up he did not see any motion in the water at the Martello's wheel; but as he did not see the schooner at the same time passing ahead of her, it is not surprising that he did not see the quick water a quarter of a mile distant. When the leading vessel has necessarily slackened her speed for an obvious temporary purpose only, such as to avoid collision by allowing another vessel to pass ahead of her, I doubt whether after this purpose is accomplished she is forbidden by article 21 to resume her previous course and speed as it ought to have been understood by the vessel behind, merely in order to enable the latter to pass ahead of her. I think the vessel ahead, in such a case, might fairly count on the other's understanding the temporary necessity and that the vessel astern would govern herself accordingly; but in proportion as any such temporary change is prolonged, the less reliance should be placed on any such presumed understanding by the vessel astern. In the present case, as everything was in clear view, and the course and previous speed of the Martello were proximately known, I should not count the resumption of former speed as an independent fault. But the fact that the Martello had lost more than half of her former speed by her considerable waiting, did make it specially obligatory on her to observe the rule and to answer the Mesaba's signal of her desire to pass, in order to prevent any possible misunderstanding, and that the pilot of the Mesaba might know her actual intention to resume full speed at once.

As respects the counter charge of overporting by the Mesaba, there is no probability in its favor, while all the witnesses say that she had not ported at all. As I have said above, since the steering

was more by the buoys than by compass, she may have turned her head somewhat to starboard without any direct order to port her helm; and unless this had been done, I do not see how she could have kept so long about parallel with the Martello, as all the witnesses say she did, since the latter certainly ported from one to two points. If, as the Martello alleges, the Mesaba was on the southerly side of the channel, it is in the highest degree improbable that she would have turned still more to the southward; there would be no possible object in doing so, but every reason for keeping well up to the northward. I do not think this charge is proved.

Most important of all, however, is the near approach of the Mesaba to the Martello as she overhauled her. It was certainly nearer than is customary with vessels of such size and at such high speed in water little deeper than their keels, whether the distance was 50 feet or 150. The distance was probably from 100 to 150 feet; and from the testimony I think that was unjustifiably near for such steamers in that locality. The Mesaba's witnesses say that such near passing is common in the Thames without any effect from suction. But the important conditions of speed and depth of water there are not satisfactorily proved, and these make a very great difference.

There can be no doubt of the strong force of suction from a large and deep vessel moving in shallow places where there is but little water beneath her keel; and this must be further increased by any great speed of the passing vessel. Here there were but three or four feet of water beneath the Mesaba's keel, and in some places less than that depth; and during the last third of a minute before collision, the Mesaba was going at 12½ knots through the water and was passing the Martello at the rate of about 6 knots an hour. The vast volume of water running in to fill up the space rapidly left vacant by her advancing bulk, had to come mostly from each side; and this force would necessarily operate in so shallow water much as it operates in slips, where at a very much lower speed in moving out, steel cables holding other vessels to their moorings, as the evidence shows, may be broken by the strain. See, also, The Bremen (D. C.) 111 Fed. 228, 231.

There are no authentic data, so far as I am aware, for determining how far suction is likely to operate laterally in a given case. It is a matter of common observation that in deep water, objects upon the surface, such as barrels, ice, etc., may be passed by vessels at considerable speed quite near, without any sensible deflection. The subject has been presented in quite a number of cases of collision, in some of which suction has been regarded as the sole or contributing cause, while in others it has been rejected. In The City of Brockton (D. C.) 37 Fed. 897, a side-wheel steamer 283 feet long collided with the tug Hartt in passing within a distance of from 50 to 100 feet. Judge Benedict on a careful consideration of the facts, deemed suction to be the cause. In The Ohio, 33 C. C. A. 667, 91 Fed. 547, the Mather was passing from 40 to 75 feet distant from the Siberia, and suction was held to be the cause of the deflection. In the case of The City of Cleveland (D. C.) 56 Fed. 729, neither the size of the vessels, nor their distance apart is stated in the report; but 50

feet was considered by Mr. Justice Brown as a safe distance for passing and the theory of suction was rejected. In The Alexander Folsom, 3 C. C. A. 165, 52 Fed. 403, the vessels were of moderate size and draft and about 60 feet apart, and going at slow speed, and the influence of suction was rejected. It was also rejected by me in The Aurania and The Republic (D. C.) 29 Fed. 98, vessels of about the same size and speed as those in this case; but according to the testimony on both sides the vessels were about 250 feet apart when their special approach to each other was noticed, and I considered that distance too great to admit suction as the cause of collision. In the present case the distance apart was probably less than half as great.

The instances cited in the present testimony, viz., of the Fuerst Bismarck and of the Westernland, indicate the undoubted influence of suction in passing at a distance of from 100 to 120 feet. The Fuerst Bismarck, one of the largest of the steamers coming into this port, was passing an oil tank in a narrow channel in shallow water, near black buoy No. 9 at the tail of the west bank at about the same speed as the Mesaba; the oil tank was much attracted towards her, first at the stern and then at the stem, and Pilot Butler testifies that collision would have resulted had he not stopped his vessel.

From these and others cases, I think there is no doubt that the strength and the lateral extent of suction caused by passing vessels, depends on quite a number of circumstances, of which the most important are the size and speed of the two vessels, and particularly the depth of the water beneath them, as well as the mass and extent of the water on each side. In abundance of water the effect is probably slight; in scanty waters, at its maximum and operative for a considerable distance. In the present case the circumstances were all favorable to its powerful action, and I think it not improbable that it was one of the operative causes of this collision, though I find no reported decision except in the City of Brockton in which the collision has been ascribed to the suction of a vessel passing at a distance of from 100 to 150 feet. Prudent navigation, however, requires the allowance of a sufficient margin for the unavoidable incidents of deviation from an exact course, through the influence of wind, of tide and of currents, and the impossibility of absolute steadiness. Where large vessels are navigating side by side at high speed, as in this case, for a distance of over a third of a mile, prudence requires, in my judgment, a separation of at least from 200 to 300 feet, as stated by the witnesses for the Martello, to avoid all these contingencies of navigation.

Without undertaking, however, to determine the specific causes of the collision, I place my decision holding both in fault upon the clear violation by both of the eighteenth article of the inland rules of navigation.

Decree accordingly.