### In re TERENS.

#### (District Court, E. D. Wisconsin. January 13, 1910.)

**BANKRUPTCY (§ 183\*) — PARTNERSHIP—MARSHALING OF ASSETS—DISSOLUTION WHILE INSOLVENT.**

A dissolution and transfer by one of two partners to the other of all of his interest in an insolvent partnership, although without actual fraudulent intent, is fraudulent in law as against partnership creditors, and does not debar them from the right to be first paid from the partnership property, and for that purpose to have a marshaling of assets between the partnership and individual estates in bankruptcy, under Bankr. Act July 1, 1898, c. 541, § 5g, 30 Stat. 548 (U. S. Comp. St. 1901, p. 3424).

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 282 ; Dec. Dig. § 183.\*]

In the matter of Nicholas T. Terens, bankrupt. On review of order of referee. Reversed.

See, also, 172 Fed. 938.

This is a proceeding to review the order made by Referee Denison declining to require the marshaling of assets as provided in section 5 of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 547 [U. S. Comp. St. 1901, p. 3424]). The facts in the case may be briefly summarized as follows:

Terens & Oswald had for 12 or 14 years been carrying on the business of selling hardware and farm machinery at Mishicot, Wis. Terens was the outside man, while Oswald looked after the books, such as they were, and attended to the financial and office business of the concern. The books were crude; no annual inventories were made; no balance sheets were taken. The firm were borrowing money from time to time, and the business drifted along in that slack way, so that neither partner had any accurate idea of the financial status of the concern. In a general way both partners supposed the firm was solvent, but subsequent events have shown that the partnership was hopelessly insolvent, as was each of the partners, for a considerable time before December 15, 1908. On the 15th of December, 1908, Oswald desired to retire from the firm, and the parties on that day entered into the following agreement in writing:

"Whereas, Nicholas Terens and William Oswald, both of Mishicot, Wisconsin, now are and have been for a long time prior hereto partners, under the firm name and styled Terens & Oswald, and as such now are and have been engaged in the general retail hardware business at Mishicot, Wisconsin; and

"Whereas, said Nicholas Terens and Ephraim Oswald as such copartners have resolved as copartners to separate and to dissolve said copartnership, and to that end the said partner, Ephraim Oswald, for a valuable consideration does hereby sell, assign, and transfer all his right, title, and interest in and to said partnership, and in and to all their stock of general hardware, farm implements, and machinery of every kind and nature, and in and to all

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and every account, chose in action, note, and security of every description, and the good will and name of the business over unto his copartner, Nicholas Terens, who is to continue the business hereafter.

"In consideration of the premises, and the transfers to him of the aforesaid right, title, and interest by his said copartner, Ephraim Oswald, in and to the property herein conveyed, the said Nicholas Terens accepts the property herein conveyed, and assumes and obligates himself to pay all of the now existing firm debts, claims, and liabilities of every kind, and hereby exonerates his copartner, Ephraim Oswald, from any liability thereunder.

"In further consideration of the premises, and the transfer of the property herein named, and the obligation assumed by the said Nicholas Terens, it is hereby mutually agreed, contracted, and stipulated by and between the parties to this contract that the firm and partnership of Terens & Oswald is forever dissolved and separated.

"Dated this 15th day of December, 1908.

"[Signed]   Nic. H. Terens.
"[Signed]   Ephraim D. Oswald.

"Signed and delivered in presence of
 "I. Craite.
 "J. G. Sawall."

The parties, however, had a further agreement and understanding that a complete inventory of assets and liabilities should be at once prepared, with a view of determining the exact financial status of the firm, and whether Oswald, the retiring partner, had any interest in the concern after providing for its debts and liabilities; and it was understood that by this method they should arrive at the compensation, if any, which Terens should pay Oswald for a transfer of his interest. As soon as the formal agreement was signed, the work of taking a complete inventory of assets and liabilities was undertaken. After several days of such investigation, it became apparent to Oswald that there would be nothing coming to him, because the debts were far in excess of the assets. Terens, however, who had certain property of his own, continued the work of the inventory, in the hope that he might be able to make a fresh loan and swing the business. By the 10th of January the inventory had progressed so that Terens' attorney advised him that the firm was hopelessly insolvent and would have to be wound up, and therefore, on the 12th day of January, 1909, Terens, after a conference with Oswald, filed a voluntary petition in bankruptcy and was adjudicated on the same day. The assets of the firm aggregated about $7,000; the bankrupts' individual estate, over and above any incumbrances, $6,950. The partnership indebtedness amounted to $13,000; the individual indebtedness of Terens, $2,000. Oswald had nothing in the way of assets and was owing a considerable sum.

After the written agreement of December 15th, the firm property remained in statu quo until bankruptcy supervened. During the meeting of creditors and other proceedings in bankruptcy, Oswald was present from time to time, and has made no objections to the custody of the trustee, and thus practically consented to the administration.

Among the other liabilities of the firm, the Bank of Two Rivers held four promissory notes, each for $2,000, signed by the partnership, and each guaranteed by the partners individually, and one promissory note for $1,000, executed by Terens alone. The bank, having proved its claim as a partnership debt, filed a petition that for the purpose of an equitable distribution the assets should be divided into two funds, one fund representing the proceeds of the individual property of the bankrupt, the other representing the proceeds of the partnership property, and that such a marshaling of assets should be had as is contemplated by section 5 of the bankruptcy act.

The referee held, in substance, that there was no partnership fund, but that by virtue of the assignment of December 15th the assets in the hands of the trustee became the individual assets of the bankrupts and that all creditors should go against the fund pari passu.

Nash & Nash, for petitioner.
F. W. Dicke, for certain creditors.
Isaac Craite, for bankrupt.

QUARLES, District Judge (after stating the facts as above). The doctrine known as "marshaling assets" has long been familiar in equity jurisprudence. Lord Romilly, M. R., in Re Professional Life Insurance, 3 L. R. Eq. 668, defines the doctrine as follows:

"It is a settled principle that when there are two classes of creditors and two funds, and one class of creditors can only go against one fund, while the other class of creditors can go against both, the court will marshal the assets, restricting the creditors who have a double security from touching the fund applicable to the payment of the first class of creditors until they are paid in full."

Congress has borrowed this doctrine from the court of equity and has incorporated it into the present bankruptcy act, section 5f of which reads as follows:

"The net proceeds of the partnership property shall be appropriated to the payment of the partnership debts, and the net proceeds of the individual estate of each partner to the payment of his individual debts. Should any surplus remain of the property of any partner after paying his individual debts, such surplus shall be added to the partnership assets and be applied to the payment of the partnership debts. Should any surplus of the partnership property remain after paying the partnership debts, such surplus shall be added to the assets of the individual partners in the proportion of their respective interests in the partnership."

The contention of the petitioner is that we have here a proper case for the application of the doctrine, there being two funds and two classes of creditors, within the meaning of the rule. On the other hand, it is contended, and the referee ruled, that by virtue of the dissolution agreement of December 15th Terens became the sole owner, and that there is now no partnership fund to be administered. It is apparent, therefore, at the outset, that this dispute hinges largely upon the construction to be imposed upon this dissolution agreement, and to that subject we may first give our attention.

It is important in the first instance to consider the situation of the parties at the time this contract was entered into. It is conceded on all hands that the firm of Terens & Oswald was hopelessly insolvent on the 15th day of December, 1908, and that it had been insolvent for several years, although from the slack business methods pursued and crude books kept the real situation had never been presented so as to amount to demonstration. Terens swears that he never would have assumed the debts of the firm if he had not supposed that he was getting assets sufficient to liquidate the firm debts. Oswald was without assets and quite heavily involved on his own account. Terens, although he had some individual property, was heavily incumbered and insolvent. The firm had not been meeting its obligations promptly, was hard pressed for ready money, and had been sued by firm creditors. It appears from the evidence that, while neither partner believed that the firm was insolvent, it must have been understood by all parties concerned that a crisis was approaching. Conferences were held with the bankers who held their paper, and with lawyers, and the dissolution was hit upon as a prudential step to meet the difficulties with which they were confronted.

This written agreement of December 15th is to be read in connection with a further oral agreement whereby an inventory of assets and

175 F.—32

liabilities was to be prepared, and the consideration moving to Oswald for his transfer to Terens was to be measured by the surplus shown by such inventory of assets over and above the firm liabilities. The making of this inventory was undertaken shortly after the agreement of December 15th, and a few days of investigation convinced Oswald that there was no surplus of assets over liabilities, and that he really had nothing to transfer, and that all the benefit that he could expect to derive from the contract was an "exoneration" from his liability as partner—that is, that Terens would make the firm assets pay the firm debts, and thus allow him to step out and escape his liability in solido. Terens continued the preparation of the inventory for several days longer, until Mr. Craite, his attorney, convinced him that he had over-estimated the assets, and that there was nothing left but bankruptcy. Terens swears that it was the understanding that he was to pay the firm debts out of the firm assets transferred to him by his partner; but he adds on cross-examination that he had some individual property from which he hoped to raise a loan which would enable him to swing the business.

Terens, after the advice of Craite, summoned Oswald to a conference, and as a result on the 10th day of January Terens and his attorney began the preparation of schedules looking to a voluntary petition in bankruptcy, and on the 12th day of January such petition was filed, and Terens was adjudicated. Under these circumstances, what was the legal effect of the dissolution agreement? What did Oswald sell? It was not specific articles of personal property. It was not a transfer of the corpus of the estate, but of only such interest in the surplus after the firm debts had been provided for. At the outset the distinction must be sharply drawn between such a transfer by one insolvent partner to another, and a sale by both partners of certain specific property to a third party. In the latter case the entire title passes by the transfer, and it has been repeatedly held that the legal right of either or both partners to sell the firm assets and transfer good title thereto is not impaired by the fact of insolvency.

It is also well settled that while each partner has the right to require the partnership property to be applied to the payment of partnership debts in preference to the debts of the individual partner, to the end that he be not required to pay the former out of his individual estate, still the right of the creditor of the partnership to payment out of the partnership property in preference to the individual creditor is derivative in nature, and is worked out by subrogation to the existing right of one of the partners to assert this equitable principle. Until the assets have been brought under the custody of the law, each partner has plenary power at any time to release or waive this right. If no partner retains this right, then no creditor of the partnership has it. Case v. Beauregard, 99 U. S. 125, 25 L. Ed. 370; Fitzpatrick v. Flannagan, 106 U. S. 648, 654, 1 Sup. Ct. 369, 27 L. Ed. 211; Huiskamp v. Moline Wagon Co., 121 U. S. 310, 7 Sup. Ct. 899, 30 L. Ed. 971.

It is strenuously insisted in argument that these authorities are decisive of the instant case. But it will be observed that in each of the cases cited certain of the firm assets had been sold by consent of all partners to third parties, so that a complete legal title to the specific items of personal property passed to the purchaser and amounted to a

complete waiver of this equitable right, and constituted a release of such assets from firm liabilities. In the instant case there has been no such disposition. The status of the firm assets was precisely the same on the 12th of January that it was on the 15th of December. The only change wrought by the dissolution agreement was in the attitude of Oswald, who by virtue thereof became a surety for the firm obligations. Brandt on Suretyship and Guaranty, § 36. I cannot see that this change in the legal attitude amounts to a waiver on the part of Oswald which would defeat the equity of the firm creditors.

Sargent v. Blake, 160 Fed. 57, 87 C. C. A. 213, 17 L. R. A. (N. S.) 1040, is cited as conclusively ruling this case. The learned judge who wrote the opinion announces two rules of law which at different times control the distribution of firm assets: First. The partners own and may in good faith dispose of the partnership property. They may apply it to their individual debts in preference to partnership debts, and may make such honest disposition of the same as they deem proper. Second. In the administration of partnership property in the courts, the creditors of the partnership have the right to the application of the partnership property to the payment of the partnership debts in preference to individual debts of the respective partners. The first he calls a rule of operation; the second, a rule of administration. Sargent v. Blake was held to fall within the first rule by reason of its peculiar facts. It seems to me that this case clearly falls within the second rule, unless Oswald has in some way waived the right, which he so strenuously insisted upon, of securing exoneration by the application of firm assets to the liquidation of firm debts.

The exact question here involved was considered in a learned and elaborate opinion by Marshall, J., in Thayer v. Humphrey, 91 Wis. 276, 289, 64 N. W. 1007, 30 L. R. A. 549, 51 Am. St. Rep. 887, where many authorities are reviewed. The conclusion reached by the court is that such a dissolution agreement, between partners who were insolvent, regarding the assets of an insolvent firm, will not release the partnership assets. A great diversity of ruling will be found in the opinions of the state and lower federal courts; and one is reminded of the terse statement by Westbury, L. C., in his opinion in Ex parte Mayou, 34 L. J. 25, in a case almost identical with the instant case:

"I take it that the principle of all the decisions is that which is shortly stated by Lord Eldon in the case of Ex parte Williams, 11 Ves. 3, in which he very concisely states that every one of these transactions must depend entirely upon the bona fides, and, without considering the question of fraudulent intent, he held that there was no bona fides in the transaction, that the assignment by one insolvent partner to the other was fraudulent in nature; that it did not operate as a conversion of the bankrupt's property into the separate estate of Wood, the surviving partner; that it must be still considered as joint property, and distributed as such among joint creditors."

In Black's Appeal, 44 Pa. 503, it is held that, when the condition of the firm at the time of the transfer is such as to warrant the partner in supposing that a necessity for marshaling assets is likely shortly to arise, it is under such circumstances a fraud in the partners to make a transfer or division of the assets and thus attempt to deprive firm creditors of their preference. In many cases, under varying circumstances, transfers by one insolvent partner to another have been held mala fides

without proof of actual fraudulent intent. In re Cook, 3 Biss. 122, Fed. Cas. No. 3,150; In re Sauthoff, 8 Biss. 35, Fed. Cas. No. 12,380; Roop v. Herron, 15 Neb. 73, 17 N. W. 353; Bulger v. Rosa, 119 N. Y. 465, 24 N. E. 853; Nordinger v. Anderson, 123 N. Y. 544, 25 N. E. 992; Peyser v. Myers, 135 N. Y. 599, 32 N. E. 699; Darby v. Gilligan, 33 W. Va. 246, 10 S. E. 400, 6 L. R. A. 740; Conroy v. Woods, 13 Cal. 626, 73 Am. Dec. 605; Olson v. Morrison, 29 Mich. 395; Phelps v. McNeely, 66 Mo. 554, 27 Am. Rep. 378; In re Worth (D. C.) 130 Fed. 927, 930; Tenney v. Johnson, 43 N. H. 144; Collins v. Hood, 4 McLean, 186, Fed. Cas. No. 3,015; Sedam v. Williams, 4 McLean, 57, Fed. Cas. No. 12,609; Marsh v. Bennett, 5 McLean, 117, Fed. Cas. No. 9,110; In re Byrne, Fed. Cas. No. 2,270. Many other cases to the same effect might be cited.

The Circuit Court of Appeals of the Seventh Circuit have just handed down an opinion in Re Filmar (No. 1,592 of the October Term) 177 Fed. 170. After discussing the provisions of sections 5a, 5f, and 5g, they hold:

"These provisions, we think, indicate very clearly that Congress intended that the bankruptcy courts should have full equitable powers in dealing with partnership matters. With the property in custody and all parties present, and no rights of innocent purchasers or transferees having intervened, a court of general equity powers would concededly award priority to Lipincott (the partnership creditor), because there had been no application of the property with the consent of the partners to the payment of individual debts (Sargent v. Blake, 160 Fed. 57, 87 C. C. A. 213, 17 L. R. A. [N. S.] 1040), because Lipincott in his own right as a partnership creditor would be entitled to equity's rule of distribution, and because Swigert (the retiring partner) for his own protection would have the right to ask that Lipincott be first paid."

It is insisted that the petitioning bank is disingenuous in posing as a partnership creditor, when its real purpose is to insist upon its right also to share in the individual assets of Terens by reason of his guaranty on the notes. In view of the fact that the Circuit Court of Appeals of the Seventh Circuit have distinctly held that a creditor so situated may have recourse to both funds (Re McCoy, 150 Fed. 106, 80 C. C. A. 60), I am unable to appreciate the force of this criticism. In Re Head (D. C.) 114 Fed. 489, it is held that such a dissolution by insolvent partners within four months must be treated as mala fides, because it works a preference in favor of individual creditors and against the joint creditors, and is violative of the spirit of the bankruptcy act. Re Worth (D. C.) 130 Fed. 927, 930.

It remains to consider and construe section 5g, which is in pari materiæ, which throws much light on the amplitude of the equitable jurisdiction conferred upon the court. It allows proof of the partnership estate against the individual estate, and vice versa. It expressly suggests the doctrine of marshaling assets to prevent preferences and to secure the equitable distribution among the several estates. The preferences supposed to interfere with a just and equitable distribution may result from the action of partners calculated to convert partnership property into individual assets, thus giving undue advantage to individual creditors. Properly construed, this subdivision meets the very case we have in hand. Re Wilcox (D. C.) 94 Fed. 107; Re Jones (D. C.) 100 Fed. 781; Re Head (D. C.) 114 Fed. 489. Re Denning

(D. C.) 114 Fed. 219, 221, was similar in its facts to the instant case, and the court concludes:

"Moreover, section 5g of the bankruptcy act was intended to clear up the whole matter, and to permit the court to deal with conversions of this kind so as not only to prevent preferences in the technical meaning of that word, but also so as to secure the equitable distribution of the property of the several estates."

In my judgment the dissolution agreement, under the peculiar circumstances of this case, did not work a liberation of the firm assets and convert the same into the individual assets of Terens, but that, when the property came to the custody of the court, Oswald still retained the right to insist upon the payment of the firm debts out of the firm assets, as he does by his consent to the administration by the court, and that by subrogation or derivation the firm creditors are justified in insisting upon such a marshaling of assets as is provided for in the bankruptcy act.

For these reasons, the finding of the learned referee is reversed, and the cause is remanded for further proceedings in accordance with this opinion.