### THE MONTEREY.

### THE UNITED STATES.

(District Court, S. D. New York. June 3, 1909.)

COLLISION (§ 39*)—OVERTAKING VESSEL.
　　Collision in the Lower New York Bay near the junction of the Maı Ship Channel and the Swash Channel between two steamers proceeding to sea. *Held* that the collision was due to the suction of the United States, which resulted from a too close approach in passing the Monterey and that the former was solely liable.
　　[Ed. Note.—For other cases, see Collision, Dec. Dig. § 39.*]
　　Overtaking vessels, see note to The Rebecca, 60 C. C. A. 254.

(Syllabus by the Judge.)

Convers & Kirlin, for the Monterey.
Wing, Putnam & Burlingham, for the United States.

ADAMS, District Judge.　These actions arose out of a collision which occurred in the Lower New York Bay, near the junction of the Main Ship Channel and the Swash Channel, between the steamships United States and Monterey, on the 16th of April, 1908.　The libel of the owner of the United States alleges the facts and the faults of the collision to have been as follows:

"First: The libellant is a corporation of the Kingdom of Denmark, which owns and operates various ocean steamship lines, including a regular service between Copenhagen and ports in the United States known as the Scandinavian-American Line.　Among such vessels is the United States, a twin-screw passenger and freight steamship of over 10,000 tons, measuring 501 feet ʾong, 58.3 beam, and 39.3 depth of hold.　She carries the flag of Denmark, and hails from Copenhagen, where she is regularly registered and documented.

Second: On Thursday, April 16th, the United States had left New York bound on her eastward voyage, with cargo and 509 passengers.　She was fully manned and equipped, with the usual corps of officers, under command of Captain Wulff, a master of long experience, and with a Sandy Hook pilot in charge.　Until the collision hereinafter mentioned, she was tight, staunch and strong, and in all respects seaworthy.

Third: In going out of the channel, below New York Narrows, the United States and the Monterey were in close company, the Monterey being ahead and on the United States' starboard bow.

The weather was clear, wind light from N. N. E. and the tide at the last of the ebb.　When approaching the junction of the Main and Swash channels, those on the United States saw a schooner on the port bow, apparently heading to cross the channel.　The engines of the United States were stopped, but it was soon seen that the schooner would not interfere with the passage of either steamship.　The United States was drawing 27 ft. 6, the Monterey only about 20 feet, and the two vessels were approaching the widest part of the channel, where ocean steamers are accustomed to meet, overtake, and pass in entire safety.

Fourth: While the United States was thus forging ahead, with stopped engines, the Monterey was heard to give two short blasts of the whistle.　The

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

United States gave two short blasts on her whistle, and then telegraphed to put her engines ahead, and proceeded to come up on the port side of the Monterey at a lateral distance of about 500 feet or upwards. Just after these two blasts, the Monterey again gave two short blasts, consenting to let the United States pass. A tugboat with mudscows was ahead of the Monterey, but close to the starboard side of the channel. As the Monterey was abreast of the United States, and the two vessels were apparently passing in safety, the Monterey appeared to starboard her helm on account of overtaking the tug boat, or for some other cause. As her bow was abaft the beam of the United States, the Monterey was observed to swing towards the United States Soon after an officer in uniform was seen to run on the Monterey's bridge to give some orders as to her helm; but evidently it was too late to break her sheer, and the Monterey swung towards the United States, so that her port bow struck the United States at the engine-room compartment, breaking in her frames and plating, and opening the hull below the load-line.

The collision was at 1:29 P. M., according to the time of the United States, and took place near the junction of the two channels. As the United States was sinking she was put over towards the West Bank, where she took the ground, the engine-room filled up with compartments No. 3 and No. 4 leaking more or less, so as to seriously damage all cargo therein.

Fifth: The United States had to employ salvors to patch the wound and pump her out and bring her back to New York, and then to hire a special pier, and discharge her cargo, part of which she has had to reship. All her passengers had to be forwarded by other vessels. She has to be dry-docked and undergo repairs, which are grave and serious, so that the full extent of libellant's collision damages and the injury to her cargo are not yet known. As far as libellant can now state, the same will amount to Two hundred and fifty thousand dollars, or upwards.

Sixth: Said collision and damage were not due to any fault or neglect on the part of the libellant, or of those navigating the United States; but were wholly due to the faults of those on the Monterey; in that she had no proper lookout, or competent navigator on the bridge; that she did not obey Rule VIII of Article 18th of the Act of June 7th, 1897; that she did not give proper whistles; that she did not adhere to the whistle signals which she did give; in that she did not keep her course, but crowded upon the course of the United States; in that she failed to keep out of the course and track of the United States, the draft of which required her to navigate only in a narrow path, whereas with the draft of the Monterey there was ample room on her starboard side, where Article 25 of the Inland Rules required her to be, and in other faults, which libellant will show upon the trial hereof."

The libel of the owner of the Monterey alleged the facts and the faults to have been as follows:

"First: At all the times hereinafter mentioned the libellant, New York & Cuba Mail Steamship Company, was and it still is a corporation, duly organized and existing under and pursuant to the laws of the State of Maine. The libellant owns and operates a number of steamships running in what is known as the Ward Line between the port of New York, ports in Cuba and ports in Mexico. One of the steamships so owned and operated by the libellant is the steamship Monterey, a twin-screw passenger and freight steamship of 4702 gross and 2948 net tons register, 341 feet in length, 47' 7" beam, and of 16' 9" depth of hold. Until the collision hereinafter mentioned, the Monterey was tight, staunch, strong and in all respects seaworthy and fully manned, equipped and supplied.

Second: On April 16, 1908, shortly after noon, the Monterey left her pier No. 13, East River, New York, with a full cargo and about forty passengers bound on a voyage to Havana, Cuba, and to ports in Mexico. The weather was fair and clear and the tide was the last half of the ebb. The Monterey carried a full complement of officers and crew properly stationed in their respective positions. The navigation of the vessel was in charge of a licensed Sandy Hook pilot. The pilot, master, third officer and quartermaster were on the

bridge, a lookout was stationed forward, and the chief officer and other members of the crew were on the forward deck.

Third: After passing through the Narrows, the Monterey steered on the starboard side of the main channel, passing close to the West Bank. The United States was coming down astern and somewhat to the eastward of the Monterey, and was seen to be shortening the distance between the vessels. The United States was a large vessel, 500 feet or more in length, and was drawing 27 feet 6 inches of water.

After the Monterey had passed the Bell Buoy at the tail of the West Bank, a schooner heading about W. N. W. on the starboard tack was seen near the upper end of the Romer Shoal. It was not, however, necessary for the Monterey to make, and she did not make, any manœuvre with regard to the schooner, as the steamer was well over on the western side of the channel, and there was plenty of room to pass ahead of the schooner.

The Monterey proceeded on her course passing close by buoy No. 9 on the western side of the channel. Shortly before reaching the mouth of the Swash Channel, the Monterey overtook a tugboat towing a mud scow. The tug and tow were heading to the southward and westward and were on the western edge of the channel. The pilot of the Monterey blew a two blast signal to the tug to indicate that he wished to pass on the port side of the tug. The tug acquiesced in this manœuvre and the steamer accordingly proceeded on her course to pass the tow, leaving the scow on her own starboard hand. Shortly afterward, the United States coming up astern of the Monterey likewise gave the tug a two blast signal indicating that she also desired to pass the tug and tow to port. The United States passed to the eastward of the scow, leaving it on her starboard hand.

Fourth: At about the entrance to the Swash Channel, the United States, proceeding at a much higher rate of speed than the Monterey, began to overlap the latter's stern in an effort to pass at the place. The Monterey was heading down the channel, well over on the western side of it, and had the ranges of the Conover Beacon and Chapel Hill Beacon lighthouses open to the westward. The United States appeared to be hauling a little to the westward and converging slightly on the course of the Monterey in order to pass well to the westward of the junction buoy which divides the southerly side of the Swash Channel from the Main Channel.

When the United States first began to overlap the Monterey, the former appeared to be passing quite close, and when she got abeam, she appeared to be somewhat nearer and not more than 100 feet off. The Monterey maintained her course and speed. As the United States drew ahead, it was noticed that she was very close to the bottom, and was stirring up the mud with her propellers. It was then low tide, and the water was very low. When the stern of the United States reached a point from a third to a half of the length of the Monterey forward of her stern, the suction of the United States began to draw the bow of the Monterey to port and notwithstanding the fact that the helm of the Monterey was ported, and hard ported, her bow was drawn in steadily towards the United States. As soon as the effect of the suction of the United States was shown on the Monterey, and danger of collision was thereby threatened, the latter's starboard engine was immediately stopped and put full speed astern with a view to assisting the port helm, and the port engine was kept going slow ahead. A moment or so later, when it was seen that the bow of the Monterey continued to be drawn steadily in towards the starboard side of the United States, and collision was unavoidable, the port engine was also reversed and both engines continued to reverse until the vessels came together at about 1:34 p. m., the port bow and stem of the Monterey coming in contact with the starboard side of the United States in the region of her engine room.

The forward plating and stem of the Monterey were broken and bent round to starboard, and the violence of the blow caused her to roll violently to starboard. As she righted herself her port bow came again in contact with the starboard side of the United States, and she scraped along aft until the United States finally drew ahead and clear. In consequence of the damage sustained by the Monterey water entered the vessel, causing damage to a part of her cargo.

Fifth: The United States did not give any whistle signal to the Monterey prior to her attempt to pass as above stated, and she attempted to pass without first securing an agreement of signals as required by Article 18, Rule 8. No whistle signals of any kind were blown by either vessel to the other prior to the collision.

Sixth: The Monterey sustained such damage that she was obliged to return to New York, discharge her cargo, and go into dry dock for repairs. The detention of the Monterey in consequence made it necessary to forward her cargo and passengers by other steamers. The repairs made necessary by the collision have not yet been completed, but the damage suffered by the libellant on account of repairs, and loss of use of the vessel, forwarding of the cargo and passengers, with the consequent loss of freight and increased expense, will be very serious. The libellant is also entitled as bailee to recover the loss suffered by the cargo. The full extent of the libellant's damages as aforesaid is not yet known, but as nearly as libellant can now estimate, it will amount to less than eighty thousand dollars ($80,000.00).

Seventh: The collision and the damage resulting therefrom were not caused nor contributed to by any fault on the part of the Monterey but were caused solely by the faults of the United States in that:

1. She did not maintain a good and proper lookout.

2. She was not properly manned and her navigation was in the hands of careless or incompetent persons.

3. Being an overtaking vessel, she failed to keep out of the way of the Monterey as she was required to do by Article 24 of the Inland Rules.

4. Being an overtaking vessel she attempted to pass on the port side of the Monterey in contracted and shallow waters without first signalling her desire and intention, and obtaining an agreement hereto as she was required to do by Article 18, Rule 8, and without otherwise complying with the requirements of that rule.

5. She attempted to pass too closely, and converged and crowded upon the course of the Monterey while passing.

6. She omitted to give the whistle signals required by law.

7. Being a vessel bound under Article 24 and Article 18, Rule 8 to keep out of the way of the Monterey, she disobeyed Article 23 in failing on approaching the Monterey to slacken her speed, or stop and reverse."

The statements of the answers were in conformity with those of the libels and it is not necessary to repeat them.

The weather and tide were as stated in the pleadings. The official tide observer stationed at Port Hamilton testified that on the day in question it was dead low water at five minutes after 2 p. m. and on that day at 1 p. m. it was .6 of a foot below mean low water; at 2 o'clock it was 1 foot below mean low water, therefore at the time of the collision, about 1:30 p. m., it probably was about .8 of a foot below normal. This was doubtless due to a heavy northwest wind which had been blowing the day before.

The United States left her pier in Hoboken at 12:10 p. m. and the Monterey left her pier on the East River about 12:30 p. m. On passing the Statue of Liberty, the latter was about a mile ahead of the former. The United States was the faster vessel and was proceeding at about 15 miles an hour. She would have overtaken the Monterey before she did had not her navigation been so much interrupted by other vessels. The speed of the Monterey was 12 miles an hour. She was also somewhat interfered with by other vessels but kept ahead until after the vessels had passed the West Bank Lighthouse.

The course of the Monterey. after passing Craven Shoal Buoy, was S. by W. ¼ W., which she kept until immediately before the colli-

sion, as stated by her pilot. It is to be remarked that the pilot said in another place that he was steering S. by W. ¾ W., a half a point to the starboard of the channel course, but this was an evident error and further the compasses of the Monterey were affected by iron cargo on board to the extent of 2 degrees westerly and were not entirely reliable. It is perfectly clear that below Craven Shoal Buoy she was well on the starboard side of the channel. She was steering by the range of Conover Beacon and Chapel Hill Beacon, which shows the course down the Main Channel, keeping it slightly open to the westward.

The course of the United States after backing out from her pier was a little on the starboard side of the river. She saw the Monterey coming out of the East River and slowed to let her pass. When she got under way again, the Monterey, pilot Heath said, was about 1000 feet ahead. The latter gained so that the pilot judged there was a half a mile's distance between them. At the Narrows, the Monterey was ahead, having the United States on her port quarter. Below the Narrows, a schooner sailing on the eastern side of the channel, appeared to be in the way of the United States, which stopped her engines for three or four minutes. Notwithstanding such a stoppage, she remained not very far behind the Monterey.

At this time, while the Monterey was well on the starboard side of the channel, the tug M. Moran was about a quarter of a mile ahead. The tug was bound down with a mud scow, on a hawser of 200 fathoms, intending to go through the Swash Channel. The usual course for such tows was through that channel and the Monterey blew a signal of two blasts, indicating that she desired to pass on the port side of the tug and tow. It does not appear that the tug answered the signal but it was understood by her navigator and he hauled his tug and tow to the westward out of the channel and of the Monterey's course.

The United States at this time was still above Buoy No. 10 and somewhat to the eastward of the Monterey. She heard the two blast signal given to the tug and understood it to be a permission or invitation given by the Monterey to the steamer to pass her to port. Accordingly the United States sounded a two blast signal, which is recorded in her log to have been an answer to the signal of the Monterey. It is claimed by the United States that the Monterey blew another signal of two blasts after the signal of the United States. I think that this contention may be true, but it does not appear to what vessel the signal was given. The Monterey denies the giving of any signals to the United States.

It seems to be fairly well established that the Monterey was proceeding about as far on the westerly side of the channel as she could prudently go, and that the United States was, until shortly before the collision, rather on the easterly side of the channel. At the time the United States sounded her two blast signal she was, her pilot said, "heading across the channel S. by W. ¾ W.," in order to pass to the westward of the Junction Buoy, which indicates the separation of the Main Channel and the Swash Channel. She was thus, assuming that the Monterey was on the channel course of S. by W. ¼ W.,

converging on her course to the extent of half a point. Treating the signals as an invitation or permission to pass ahead, the United States proceeded to pass the Monterey to port between Buoy No. 9 and the Junction Buoy. When the former attained her full speed, she would go about 300 feet per minute faster than the Monterey.

There is a great divergence in the testimony as to the distance the vessels were apart when the United States began to overlap the port quarter of the Monterey. The libel of the United States claims it was a good ship's length (515 feet) and her witnesses gave estimates varying from 300 to 800 feet. The witnesses on behalf of the Monterey said when the United States came up alongside she was distant from 75 to 150 feet.

The United States came nearer to the Monterey as she drew ahead. This was no doubt due to the converging of the courses, because I do not think there can be any reasonable doubt that the Monterey was proceeding on a course of S. by W. 1/4 W., as testified to by her master. He did not state it was so from his observation of the compass but no doubt it was from his knowledge of the compass course and what he saw his own vessel was doing.

The Monterey during the approach of the United States maintained her course and speed. The log of the United States records that "the Monterey kept, however, her course unchanged parallel with ours."

With reference to the distance between the vessels before anything occurred which created apprehension of collision, I think the difference should be decided in favor of the Monterey's contention and that the United States attempted to pass when the vessels were apart a distance of about 100 feet. As she drew up abreast, the helm of the Monterey was kept "steady aport," a caution to the wheelsman to keep her perfectly straight and counteract any tendency of the vessels to veer together. When the United States was from one-third to one-half past and the bow of the Monterey was opposite a point about 2 points abaft the beam of the United States, the Monterey turned in the direction of the United States, notwithstanding a hard-aport helm and the starboard engine being put full speed astern and the port engine being kept going ahead to assist the port helm. Upon its being found that these precautions did not have the desired effect, both engines were reversed at full speed, but the collision occurred, the bow of the Monterey striking the starboard side of the United States at an angle of about two points. There were two blows, one succeeding the other almost immediately.

The collision occurred near the junction of the Swash Channel with the Main Ship Channel, about abreast of the Bell Buoy and well over to the westerly edge of the channel.

The United States was damaged in the region of her engine room to such an extent that it was necessary to beach her on the mud, near Buoy No. 7. Her engine room subsequently filled. A day or two later she was pumped out and brought back to New York. The Monterey was also seriously damaged. Water entered her in considerable quantities, but she remained afloat and returned to the city under her own steam.

The faults alleged against each vessel are set forth in connection with the pleadings, supra.

Each vessel claims that the other violated the overtaking rule, which provides:

"Rule VIII. When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam-whistle as a signal of such desire, and if the vessel ahead answers with one blast she shall put her helm to port; or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam-whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall put her helm to starboard; or if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam-whistle, not less than four, and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done, when said vessel ahead shall signify her willingness by blowing the proper signals. The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel."

It was evidently incumbent upon the United States as an overtaking vessel to obtain the consent of the Monterey to pass ahead, and the United States claims that such consent was obtained, which the Monterey denies. Great stress is laid by the United States upon the necessity for the consent and the claim that it was obtained, but I am unable to see that it was of much importance in this case. The Monterey expected the United States to pass and though she claims she did not consent by signal, her movements were in conformity with the duty that would have been imposed upon her by a consenting signal, that is, she kept well on the starboard side of the channel, where she belonged, and she did not attempt to cross the bow or crowd upon the course of the United States until she was drawn towards her. There was no movement of the Monterey's helm which would turn her towards the United States and when she found she was being drawn in that direction, she did everything that seemed to her proper to avoid the collision. If she did not do everything she should, and there was fault, it was evidently in extremis.

The United States blew a signal of two blasts to the Monterey which the latter treated as a signal to the Moran. The navigators of the United States emphatically state that her signal was intended for the Monterey. I think that is probably true. The Monterey was the vessel she had to deal with. It was not necessary that the United States should secure co-operation from the Moran, which was entirely out of her way and it was necessary that she should, in compliance with the rule, notify the Monterey of her intention, which she did. She supposed that she had received a consent from the Monterey and acted upon it. It may be assumed that the rule with respect to signals was complied with by both vessels and it leaves the question where it was with regard to signals, i. e., which vessel encroached upon the course of the other? Of course the Monterey did, at the end, turn into the United States and if that was the result of any fault on her part, she should be held for the results of the collision, but she claims exemption from any liability because the United States approached

her so closely in passing that she became subject to the influence of the suction of the United States.

Suction is a force that has existed a long time and been recognized as a danger in close navigation especially in shallow waters. No instances have been given of a collision due to it at this particular place but many have occurred in the Lower Bay and have always resulted from a too close approach. That seems to have been the cause here. The United States, the larger vessel, and navigating without much water under her keel, in passing the Monterey, approached too close to her, with the result that the Monterey lost all power over herself and turned into the United States, with the disastrous result of causing damages to the two vessels, said to have been in excess, of $300,-000. I cannot see any cause for this collision except the fault of the United States in endeavoring to pass the Monterey when the vessels were on slightly converging courses in close proximity, due to the United States getting over in the waters to which the Monterey was primarily entitled. It has been recognized by the United States that if she was guilty of this error she should respond for the results in the claim that the Monterey was navigating in the eastward part of the channel and caused a collision "out of her own water by 600 or 700 feet." It is quite evident that the Monterey was, until she felt the force of the suction of the United States, well to her starboard side of the channel, to the westward of a line of the beacon range in the channel. and that the result of the suction did not have the effect of removing her therefrom, when the collision took place.

There will be a decree in favor of the Monterey, with an order of reference. The libel in behalf of the United States is dismissed.