THE LEHIGH.

THE DENVER.

(District Court, S. D. New York. June 6, 1910.)

COLLISION (§ 102*)—OVERTAKING STEAM VESSELS—SUCTION.

As the steamship Denver, 390 feet long and drawing 23 feet aft and 17½ forward, was passing through the Main Ship Channel from New York Bay to the sea at a speed of 12½ knots or more she slowly overtook the tug Lehigh, which was on an almost parallel course and 150 feet or her port side. The tug, which was 150 feet long and drew about 15 feet, slowed down intending to pass to the westward under the stern of the Denver, when she took a sudden sheer to starboard and struck the steamship about 40 feet from the stern. The wheelsman of the tug testified that the wheel was not ported. *Held*, on the evidence, that the collision was caused by the suction of the Denver, and that she was in fault for not appreciating the danger and taking precautions to obviate it by reducing speed or keeping at a greater distance; and that the tug was also in fault for reducing speed which rendered her more subject to the force.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 102.*

Overtaking vessels, see note to The Rebecca, 60 C. C. A. 254.]

In Admiralty. Suit by the New York & Texas Steamship Company. as owner of the steamship Denver, against the steam tug Lehigh, and cross-libel by the Lehigh Valley Transportation Company, as owner of the Lehigh, against the Denver. Decree in favor of each for half damages.

Mr. Brown, for the Denver.

Mr. Kirlin, for the Lehigh.

HOUGH, District Judge. At 4:20 p. m. of March 31, 1906, the Denver left Pier 16 East river bound out to sea, and at 4:30 p. m. the Lehigh left the stakeboat at Red Hook Flats bound to Perth Amboy. The Denver is a large coastwise steamer 390 feet long, and on the afternoon in question was drawing over 23 feet aft and 17½ forward. The Lehigh is an ocean-going tug, 150 feet long; and, with a very full supply of coal and water on board, was drawing an average of 15 feet. The times of departure above stated are not only testified to without contradiction, but admitted in the pleadings. Nearly, if not exactly, at 5:15 p. m. the vessels collided in the Main Ship Channel, somewhere between the West Bank Light and the Perch buoy at the entrance to the Swash Channel. The testimony in the case was taken so long after the collision that no serious effort is discovered in the record to ascertain what if any difference existed between the clocks on tug and steamer. It is in evidence that the Lehigh's clock was kept accurately with local time as indicated by the Western Union time ball; and, in the absence of any testimony to the contrary, it is assumed that the clocks of the respective vessels were practically synchronous. The witnesses have not agreed as to exactly where the collision took place by about a mile; the master of the Lehigh fixing the collision just below the West Bank Light, and Capt. Barstow of the Denver just off Perch buoy. I do

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

not think this difference very important, for wherever they were when collision occurred they were necessarily at the same place; and the Denver had started to get there 10 minutes before the Lehigh. If the exact spot of collision were important, I should attach greater weight to the testimony of Capt. Barstow of the Denver than to that of any observer on the Lehigh, because the Denver was steering by the buoys and was of such draft as to require strict attention to the channel; whereas the Lehigh was not confined to the Main Ship Channel and could have turned off and pursued her voyage to Perth Amboy by porting her wheel as soon as she passed the West Bank light.

Concerning the method of collision and the causes therefor the parties are not agreed further than this, viz.: Just before the Lehigh began to swing toward the Denver the vessels were side by side in the Main Ship Channel about 150 feet apart, with the stem of the Lehigh abreast or slightly forward of the port side of the Denver's bridge; and they were then on apparently parallel courses. The Denver avers that contact occurred with the bow of the Lehigh against the Denver's port quarter some 40 feet from the stern, with the tug at about right angles to the steamship. On the facts thus asserted the Denver declares the Lehigh in fault for deliberately porting her helm, trying to go under the Denver's stern, and failing to succeed in that obvious maneuver. The Lehigh agrees with the foregoing thus far only, viz., she did intend to go under the Denver's stern, having gotten far enough below the West Bank Light to turn with safety toward Perth Amboy. With this purpose she slowed her engines (to let the Denver get well ahead) and was instantly caught in the suction of that vessel and drawn against the larger vessel's side, the bluff of her starboard bow striking the Denver's quarter, twisting the tug's forward parts from starboard to port, and starting everything forward of her bulkhead.

It thus appears that the question of overwhelming importance in this case is: Which was the overtaking vessel? But before that inquiry is reached, it is almost equally important to ascertain the manner of their contact; i. e., whether head on, or a species of "slapping" blow. On this last point I am convinced that the statements for the Lehigh are more nearly correct, because there can be no doubt as to the nature of the injuries received by the tug; and such injuries would in my judgment have been impossible, had the blow been delivered at right angles; the damage done to the Denver also is neither in kind nor severity the natural result of a right-angle collision; and, finally, the observers on the Lehigh, being much nearer the point of contact, were in a better position to see just how the vessels did come together, and their intention of telling the truth, as they saw it, is unimpeached. As to which of the colliding vessels was the overtaker, within the legal meaning of the word, it seems to me beyond question that when they came near enough to each other to require each to take the other into account in pursuing safe and proper navigation the Lehigh was in the lead and the Denver considerably more than two points abaft her beam. The speed of the Denver is estimated by her own officers

at from 12 to 12½ knots. She encountered no difficulties which made her stop, for any considerable time at all events, in going down the bay; while possibly from the time she was clear of her pier, and certainly from the time she had Castle William abeam, she traveled at full harbor speed. She must have done this (according to her own evidence) for it required but 55 minutes (assuming the collision to have occurred off the Perch buoy) to travel as nearly as can be estimated 12¼ knots. This gives a speed of over 12½ knots per hour, and if (according to her master's experienced estimate) it required 10 minutes to get up full speed and arrive off Castle William, the balance of the distance must have been covered at even more than that rate of progress. The Lehigh, on the other hand, had but 45 minutes wherein to traverse not over 9¼ knots, and she, too, maintained her usual harbor speed without serious stoppage or delay, so far as this testimony shows. It is I think impossible that at any time the Lehigh could have been behind the Denver; and I conclude that from about Craven Shoal down the steamers were on slightly converging courses, with the Denver slowly overhauling the Lehigh. The collision therefore happened while the larger and faster vessel was in the very act of finally passing the smaller and slower one in a distinctly narrow channel and in shallow water, and when they were confessedly in such a situation as to require each to observe the other carefully.

The ultimate question is, therefore, this: Was the proximate cause of this collision a porting of the Lehigh's helm in order to pass under the Denver's stern, or the suction of the Denver? It is plainly true that Capt. Barstow of the Denver did not think at the time that suction had anything to do with it; he thought (and thinks) that the tug was "too far away when she started to port her helm for any suction. She was certainly a length away * * * 150 feet." And consequently he "never gave the least thought to suction, not a particle; it never came into my mind until this suit came up. I thought it was simply misjudgment; that is my idea of it." But nobody on the Denver can or does definitely swear to a porting of the helm. The testimony when considered amounts to this: The movement of the Lehigh was so violent and so quick that it could only be accounted for by a sudden helm movement. Such testimony is rather the expression of a theory than the statement of a fact, and is in my judgment overborne by the categorical denial of the intelligent and experienced man at the Lehigh's wheel, and by the very enormity of the error that would have been committed if he had done what the Denver thought he did do. It follows therefore that some explanation of the Lehigh's sheer to starboard other than a sudden porting of her helm must be found, and in my judgment it can only be found in the suction of the Denver. This matter has been gone into thoroughly by Brown, D. J., in The Mesaba (D. C.) 111 Fed. 215, and it was there held that when large vessels are navigating side by side at high speed for a distance of over a third of a mile prudence requires a separation of at least from 200 to 300 feet. This case has been followed in The Fontana, 119 Fed. 853, 56 C. C. A. 365, and The North Star (D. C.) 132 Fed. 145, where

the earlier cases are collated. See, also, The Aureole, 113 Fed. 224, 51 C. C. A. 181, and The Monterey (D. C.) 171 Fed. 442.

If the influence of suction did not occur to a navigator of the high character of Capt. Barstow, it is quite as plainly true that the possibility of danger from that cause did not at the time occur to any one on the Lehigh. One rarely finds a more perfect picture of security than the evidence reveals on the tug within two minutes of serious collision. The pilot was at the wheel. The captain was in his room just aft of the wheelhouse talking to the chief engineer about indifferent matters, and his son (who, though a passenger at the time, is a licensed shipmaster) was dozing in an easy chair near the door leading from pilot house to the captain's quarters. Yet they all knew that a large steamer was overhauling them on their starboard quarter, and the pilot at the wheel perceived that "the steamer was not going away from us very fast, so I slowed her down, as we had to turn in * * * to the westward, and * * * a few seconds after I slowed her down * * * I noticed she took a sheer." It is necessarily true that the moment the Lehigh slowed her engines she surrendered a certain amount of power, became less easily manageable and more subject not only to the suction influence of a large passing vessel, but to any other force tending to divert her from the course she was on. But no one on the Lehigh thought of this, and it is plain to me that not until they had gotten to Perth Amboy and talked the matter over with Capt. Cherry (the marine superintendent of the Lehigh Valley) did they on his suggestion conclude that their damages had been caused by the influence now asserted. No signals had been exchanged between steamer and tug, and it was still daylight when the collision occurred. The cases already cited have distinctly put upon the overtaking vessel liability for damages caused by her suction. The effect of them is to lay upon the navigator of a large vessel, intending to pass a smaller one from behind, knowledge of the danger, threatened by the intended passage. No such knowledge existed in this case, and no measures of precaution were taken. But the overtaken vessel has relative duties and responsibilities laid upon her by law. She should maintain her course and speed until the contemplated maneuver is accomplished. And surely the now proven and judicially ascertained dangers arising from suction do not render those duties and responsibilities less obligatory.

The Lehigh unnecessarily slowed and thereby obviously rendered herself more liable to be injured in just the way she was. This at least casts the burden upon her of showing that her act did not contribute to the joint damage. There is no evidence given to sustain that burden, and it is in my judgment at least probable that had the Lehigh not slowed she would have escaped damage, for a very slight diminution of her sheer to starboard would have enabled the Denver to pass by. She only failed by about 40 feet. It follows, therefore, that each libelant should have a decree for half damages and half costs.