## HARBOR TOWING CORPORATION
### v.
### SS CALMAR, her tackle, apparel, equipment, etc.
### and
### Calmar Steamship Corporation, a body corporate.
### Civ. No. 72-854-T.

United States District Court,
D. Maryland.

Oct. 2, 1973.

John T. Ward and Ober, Grimes & Shriver, Baltimore, Md., for Harbor Towing Corp., plaintiff and counter-defendant.

William R. Dorsey, III, and Semmes, Bowen & Semmes, Baltimore, Md., for SS Calmar and Calmar Steamship Corp., defendant and counter-plaintiff.

THOMSEN, District Judge.

This Rule 9(h) case arises out of a collision between the Tug William E. Voyce, Jr.,[1] and the SS Calmar in the Brewerton Channel, Eastern Extension, in the Chesapeake Bay, at about 1411 on 6 February 1972. The weather was clear, visibility was good, the seas were calm, and wind and tide were not factors. Each vessel claims that the other was at fault.

The Calmar[2] had passed through the

---

1. The Voyce, owned by Harbor Towing Corp., had the following characteristics: length, 105.3'; beam, 22.1'; gross tonnage, 212; net tonnage, 144; diesel powered, HP 900; air controls; one propeller, four blade, right hand, 84" diameter, 57" pitch; single rudder.

2. The Calmar, owned by Calmar Steamship Corp., had the following characteristics: overall length, 522' 10½"; beam, 71' 6"; gross tonnage, 11,425; net tonnage, 7,633; steam turbine, HP (normal at 85 rpm) 9000 SHP; Control, Engine Order Telegraph (manual); one propeller, solid, right hand rotating, pitch at .7R, 21.669 feet; single rudder.

Chesapeake and Delaware Canal and shortly before 1400 was proceeding in a southerly direction down the east side of the Chesapeake Bay in the Tolchester Channel, approaching the intersection of that channel with the Brewerton Channel, Eastern Extension, which runs westerly toward Baltimore harbor. The Calmar, with a Federal pilot at the conn, was making about 15.3 knots, traveling light, in ballast, drawing about 10′ 2″ forward and 20′ 6″ aft.

The Voyce had passed through the Canal before the Calmar, and shortly before 1400 was proceeding southerly just west of the Tolchester Channel, on the same rough heading as the Calmar. The Voyce was making 9 knots, "hooked up" (i. e., full speed), with the mate at the helm. She was drawing about 13′ 2″.

Each vessel was aware of the presence and position of the other, but neither knew whether the other was going to turn west toward Baltimore or proceed down the Bay, until the Calmar saw the Voyce turn right about 1½ miles north of the intersection of the two channels, cutting the corner at about 45° to each.

The Voyce saw the Calmar make the 90° turn into the Brewerton Channel, Eastern Extension, and straighten up in that channel abreast of buoy R2, the first buoy on the north side. The Voyce was then headed for buoy R4, which is some 7⁄10 of a mile west of R2. The position of the Voyce when the Calmar made her turn cannot be determined with any degree of accuracy because of a discrepancy between the testimony of the mate of the Voyce and a mark which he made during his testimony on a chart which was in evidence. At some point the Voyce slowed to half speed, 4.5 knots, and a short distance from R4 turned westerly parallel to the north side of the channel. The mate set her jack staff right on buoy R6, which is a little over a mile west of R4, and reduced speed to idle, making about 2 knots. After weighing all the evidence and consider-

ing the credibility of the several witnesses, the court concludes that the distance from the north side of the channel at which the Voyce idled was not more than 20 feet.[3] There was a sufficient depth of water north of the channel for a distance of at least 800 yards in all directions in which the Voyce could have navigated safely until the Calmar passed her.

Both the Calmar and the Voyce had noticed a cargo vessel, the Wilford, heavily laden, coming easterly down the channel. While the Calmar was still southbound in the Tolchester Channel, she had communicated with the Wilford by VHF radio and they had agreed on a port to port passing. The Calmar had attempted unsuccessfully to communicate with the Voyce.

The Calmar lowered her speed to about 14 knots just after completing her turn at R2 and proceeded westerly near the middle of the channel, which is 400 ft. wide. The Wilford was about at R6 when the Calmar was approaching R4. The Calmar wanted to pass the Wilford between the two buoys, R4 and R6, and when the Calmar was about opposite R4 she changed her course 1° to starboard and shortly thereafter another 1°, to give the Wilford more room to pass.

The Calmar did not give a two-blast whistle signal to the Voyce to indicate her intention to pass on the port side of the Voyce, because such a signal would have been confusing to the Wilford. The failure to give such a signal did not cause or contribute to the collision, since the Voyce knew that the Calmar would remain in the channel and pass on the port side of the Voyce.

The Calmar did not reduce her speed below 14 knots as she approached the Voyce, although those on the bridge of the Calmar could see that the Voyce was approaching and shaping up near the edge of the channel.

3. That is the distance which the mate of the Voyce gave at the Coast Guard hearing on the day after the collision.

While the Calmar was passing the Voyce, the bow of the Voyce veered toward the Calmar, struck the starboard side of the Calmar about 33 ft. from her stern, and thereafter struck the starboard side of the Calmar's propeller.[4]

The Voyce contends that the cause of the collision was the suction produced by the Calmar's passing close to the Voyce at a speed of 14 knots while the much smaller Voyce was idling.

The Calmar contends that the Voyce intended to enter the channel close behind the Calmar, so that the Voyce could "hitch a ride" to Baltimore, i. e., be able to make better speed in the wake of a large vessel than it could otherwise have made, and that the collision was caused by the mate of the Voyce making a premature turn to port for that purpose.

Able and industrious proctors for the respective vessels have cited several Inland Rules,[5] and many cases dealing with overtaking situations. None of the cases cited or found involved facts closely similar to those in the instant case. For many years, however, the danger of suction has been recognized. The Mesaba, 111 F. 215 (S.D.N.Y.1901, Brown, J.); The Potomac, 70 App.D.C. 215, 105 F.2d 94, 95 (1939, per Groner, C. J.); Pan American Petroleum & Transport

Co. v. S. S. Steelore, 220 F.2d 688 (4 Cir. 1955); American Trading & Production Corp. v. T. J. Stevenson & Co., 113 F.Supp. 332 (S.D.N.Y.1953); Union Oil Co. v. Tug Mary Malloy, 414 F.2d 669, 672 (5 Cir. 1969). See also Griffin on Collision, §§ 61 and 257.

Although suction diminishes as the distance between two vessels increases, the court finds that in view of the relative size of the Calmar and the Voyce, the depth of the water, and the relative speed of the vessels at the time of the passing, there would have been substantial suction at distances up to 200 feet.[6] If the Calmar was straddling the midline of the channel the distance between the vessels was 200 feet; the court finds, however, that in view of her intention to pass the Wilford port to port between buoys R4 and R6 the Calmar was already across the midline of the channel when she passed R4 and the Voyce, thus reducing the distance between the two vessels to less than 200 feet.

The Calmar was clearly at fault and in violation of Articles 24 and 23 of the Inland Rules, see n. 5 above, when she approached and passed so close to the Voyce without reducing her speed below 14 knots.

4. At the time of the original impact, the Voyce was about perpendicular to the side of the Calmar.

5. Art. 24 of the Inland Rules, 33 U.S.C. § 209, provides:

"Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel.

"Every vessel coming up with another vessel from any direction more than two points abaft her beam, that is, in such a position with reference to the vessel which she is overtaking that at night she would be unable to see either of that vessel's side lights, shall be deemed to be an overtaking vessel; and no subsequent alteration of the bearing between the two vessels shall make the overtaking vessel a crossing vessel within the meaning of these rules, or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear.

"As by day the overtaking vessel cannot always know with certainty whether she is

forward of or abaft this direction from the other vessel she should, if in doubt, assume that she is an overtaking vessel and keep out of the way."

Art. 23 of the Inland Rules, 33 U.S.C. § 208, provides:

"Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

Art. 29 of the Inland Rules, 33 U.S.C. § 221, provides:

"Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences * * * of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

6. This finding is supported, inter alia, by the testimony of the expert witness called by the Voyce, who discussed the various factors involved.

There was also fault on the part of the Voyce. Even though she was the overtaken vessel, she should not have chosen to shape up and idle within 20 feet of the channel while the Calmar was approaching her so rapidly.[7] The Voyce had at least 800 yards in all directions north of the channel in which she could safely have navigated and chosen a position in which to shape up and idle until the Calmar passed. Her officers were charged with knowledge of the danger of suction, as well as the pilot on the Calmar. This fault on the part of the Voyce contributed to the collision.

As noted above, proctor for the Calmar contends that the Voyce intended to enter the channel close behind the Calmar, so that the Voyce could "hitch a ride" to Baltimore. It is not implausible that the mate of the Voyce had this intention, and that he made a premature turning to port for that purpose. But the mate did not admit that he had deliberately turned to port; he denied that he did so. He testified that he intended to let the Calmar pass and follow in back of her to Baltimore, and that he did not shift his direction until after he felt the suction. Despite some testimony from the mate of the Calmar that he saw the mate of the Voyce use his hand in such a way that he concluded the mate of the Voyce was deliberately making a turn to port, the court does not find that fact from the weight of the credible evidence.

The mate of the Voyce testified that he was idling when he first felt the suction; that he then "put the rudder hard down", i. e., full right, and when he got no immediate reponse, "put her in reverse". The court accepts this testimony, but finds that the mate should have known that as soon as he obtained some sternway, the right rudder would cause or facilitate a turn of the bow to port, clearly an undesirable result under the circumstances. His action contributed to the severity of the collision.[8]

Since the court has found that both vessels were at fault, the present law requires that each pay one-half of the total damage. The Catharine v. Dickinson, 58 U.S. (17 How.) 170, 177, 15 L. Ed. 233 (1855).[9]

The parties agreed before the trial that the court should decide the question of liability, leaving the amount of damages for later settlement or decision.[10]

---

7. The Voyce was aware not only of the approach of the Calmar, but also of the imminent approach of a third vessel on such a course that it would meet and pass the Calmar at a point close to where the Voyce had chosen to shape up.

8. However, the court finds that there would have been a collision, albeit less severe, if the Voyce had done nothing; the court has made no finding as to whether the Voyce could have avoided the accident by any action on her part after her mate felt the suction.

   The court does not find that the Voyce has met the burden resting on her to show that an in extremis situation existed at the time the mate of the Voyce put the rudder hard down and when he got no immediate response "put her in reverse".

9. This rule has been criticized over the years by able judges and commentators. See Gilmore and Black, The Law of Admiralty, § 7-20, p. 438 et seq., and the authorities cited therein. Last year the Supreme Court granted certiorari in Union Oil Co. v. The San Jacinto in order to consider the continued validity of the divided damages rule, but did not reach the question because the Court found only one vessel liable and did not address the question in its opinion. 409 U.S. 140, 93 S.Ct. 368, 34 L.Ed.2d 365 (1972), particularly the dissenting opinion of Justice Stewart, at 150, 93 S.Ct. at 374.

10. It was stated, however, that the damage claimed by the Calmar was greater than the damage claimed by the Voyce. If this court were not bound by the existing rule, it would not require the Voyce to pay more than her own damage.