INTERCONTINENTAL BULKTANK
CORP., a New York Corporation,
Plaintiff,

v.

M/S SHINTO MARU, its engines, tackle,
apparel and furniture, and Shinto Kaiun
K.K. Ltd., a corporation, Defendants.

SHINTO SHIPPING CO., LTD. (SHINTO
KAIUN K.K.) and Tokyo Marine &
Fire Insurance Co., Ltd., Plaintiffs,

v.

S/T OVERSEAS ALASKA, its engines,
tackle, apparel and furniture, et
al., Defendants.

Civ. Nos. 75–394 and 75–760.

United States District Court,
D. Oregon.

Nov. 8, 1976.

Paul N. Diagle, Portland, Or., for Overseas Alaska.

Erskine B. Wood, Portland, Or., for defendants.

BEEKS,* Senior District Judge:

These consolidated cases arise out of an unusual collision between S/T OVERSEAS ALASKA, partially laden with a cargo of grain, and M/S SHINTO MARU, fully laden with a cargo of logs, occurring on the Columbia River off Jim Crow Point (Light 19) approximately 10 miles up river of Astoria, Oregon at 1805 hours on April 25, 1975. Both vessels were at the time outbound with OVERSEAS ALASKA endeavoring to overtake SHINTO MARU. Collision took place during daylight with good visibility and temperate weather. The instant actions were instituted to fix liability for the resultant damage to each party and to adjudicate an indemnification claim made by Tokyo Marine & Fire Insurance Company, a subrogated insurer of cargo laden on SHINTO MARU, against OVERSEAS ALASKA (and her owner and operator) for general average contribution.[1]

## FACTS

OVERSEAS ALASKA, built in 1970, is 731 feet in length, 105 feet in breadth, 57 feet in depth, of 34,440 gross tonnage and 20,000 horsepower. SHINTO MARU, built in 1971, is 452 feet in length, 70 feet in breadth, 39 feet in depth, of 9,039 gross tonnage and 8480 horsepower. Both vessels were then under the conn of Columbia River pilots, Gordon Howe on SHINTO MARU and R. B. Pollit on OVERSEAS ALASKA, who had boarded their respective vessels at

Longview, Washington about three hours prior to the mishap. SHINTO MARU departed Longview first at 1451 hours followed by OVERSEAS ALASKA at 1535. Upon departure SHINTO MARU had a draft of 25 feet forward and 30 feet aft; OVERSEAS ALASKA had a draft of 29 feet forward and 30 feet aft. Once underway OVERSEAS ALASKA gained steadily on SHINTO MARU until about one-quarter mile separated the vessels at which time Howe communicated by radio-telephone with Pollit inquiring as to his intention. Pollit replied that he wished to overtake, and it was agreed that the maneuver be undertaken in "the vicinity of the reach between Three Tree Point and Light 21A."[2] Pollit then, at the direction of the master of OVERSEAS ALASKA, dropped farther astern SHINTO MARU to a distance of about one-half mile.

At 1750 hours[3] near Rockland Light 27 SHINTO MARU reduced speed to slow ahead ostensibly to expedite the planned overtaking. For her part OVERSEAS ALASKA increased engine speed from full maneuvering speed to full sea speed at 1754 in preparation to overtake and pass. As the vessels neared the reach in the vicinity of which the passing was to occur, OVERSEAS ALASKA was making about 15 knots over ground and SHINTO MARU 8 to 9 knots over ground taking into account a 1 to 1½ knot following current.

OVERSEAS ALASKA did not in fact overhaul SHINTO MARU until the latter was abeam or nearly abeam Light 21A. The navigable channel at this point is about 600 feet in breadth having a depth of approximately 50 feet which decreases steadily, though irregularly, to approximately 40 feet farther down river at the collision site. Overtaking commenced, and as the bow of OVERSEAS ALASKA began to lap the

---

* The Honorable William T. Beeks, Senior United States District Judge for the Western District of Washington, sitting by designation.

1. In the collision aftermath general average was declared to which Tokyo Fire & Marine Insurance Company contributed $8,124.70 on behalf of its insured cargo.

2. Pretrial Order, admitted fact no. 13.

3. Times specified herein for SHINTO MARU engine activities are taken from engine tape records accurate to within 30 seconds. Times of OVERSEAS ALASKA engine activities are taken from her bridge bell book.

stern of SHINTO MARU, Pollit requested Howe to put SHINTO MARU full ahead for better rudder control. Howe had already done so moments earlier on his own initiative. OVERSEAS ALASKA attempted to overtake to the port of SHINTO MARU as SHINTO MARU hugged the center of the Upper Pillar Rock Ranges which was, given the starboard proximity of shoal water, as far to the right as she could prudently navigate.

Whistle signals were not exchanged between vessels as they conceived and executed the passing maneuver. However, in view of the continuous radio-telephone communication between pilots and the excellent visibility, I find, and the parties agree, that such failure to signal—though a technical violation of Inland Article 18, 33 U.S.C. § 203—could not and did not contribute to the ensuing collision.

Notwithstanding the maintenance of her engine at full sea speed OVERSEAS ALASKA's speed slackened to about 13 knots as she pulled alongside SHINTO MARU. Pollit testified that, in his opinion, this was due to

> both vessels being in the same vicinity in that cross section of channel and their action to the water, their action pushing the water ahead of them, the action of the increasing pressure of the water built up ahead of them. . . .[4]

Conscious of this phenomenon and in order to hasten the maneuver, Pollit contacted SHINTO MARU asking that her speed be reduced. Howe accommodated by ordering SHINTO MARU's engine to slow ahead. This occurred at 1802.5 hours. SHINTO MARU's speed then slowed slightly to 7 to 8 knots over ground.

As OVERSEAS ALASKA drew up stem-to-stem with SHINTO MARU, the latter experienced a slight sheer to starboard (3° to 5°) to which Howe responded with 20° port rudder for several seconds until the deviation was corrected, thereupon returning her rudder amidships. SHINTO MARU had only momentarily resumed her original attitude when she became subject to a powerful sheer force to port which exercised an ever-increasing influence over her as her bow began to swing to port toward OVERSEAS ALASKA. Howe first ordered 20° starboard rudder followed without pause by hard starboard together with full ahead engine speed in an effort to gain rudder power sufficient to counteract the sheer. Unfortunately these efforts were unavailing. The swing continued and accelerated until the bow of SHINTO MARU struck OVERSEAS ALASKA on her after starboard quarter. It appears, and I so find, that both vessels were helpless to avert the casualty once SHINTO MARU's bow began swinging to port under the influence of the sheer. Prior to that time OVERSEAS ALASKA could have safely abandoned the maneuver and fallen back behind SHINTO MARU.

The amount and sufficiency of lateral clearance between vessels once the passing was in progress is subject to dispute. I find by the greater weight of credible evidence that upon commencement of the maneuver OVERSEAS ALASKA established and maintained a vessel separation skin-to-skin of at most 200 feet, probably less.[5] The sufficiency of this distance will be discussed

---

4. Transcript at 97.

5. Both pilots, who were in at least as good of a position to reckon distance as anyone else, testified that the vessel clearance was 200 feet more or less (". . . no less than 200 feet." —Pollit; "Approximately 200 feet."—Howe). Captain Ludolph von Tangen, master of OVERSEAS ALASKA, testified by deposition that the separation was about 150 feet in his judgment. Captain Goiche Murakami, master of SHINTO MARU, testified by deposition that the vessels were "extremely close." Other testimony on this subject was uncertain and inconclusive. I strongly suspect that the vessels were as close as 150 feet of one another. I hold to this conclusion in consideration of the inherent imprecision of naked eye reckoning (even when done by experienced pilots), the inevitable tendency of self-interest to either consciously or subconsciously inflate the pilots' estimations, and the inescapable fact that a serious collision did indeed occur due to most substantial hydrodynamic forces of interaction between vessels.

subsequently. Throughout the attempted passing both vessels endeavored to hold their respective parallel courses and were successful until SHINTO MARU was overmastered by the aforementioned sheer force. I have no doubt but that the collision was attributable to the hydrodynamic force commonly and traditionally called "suction." [6]

Before treating the legal issues raised herein, I would make mention of one additional circumstance attending the collision. OVERSEAS ALASKA stood to realize no appreciable benefit had she successfully overtaken SHINTO MARU at the indicated time and place. Both vessels were then proceeding down river to the Astoria Pilot Station where river pilots Pollit and Howe would be relieved by bar pilots for the continuation of the voyages across the Columbia River Bar. It was a Friday evening, and OVERSEAS ALASKA would continue on from Astoria to Tacoma, Washington where she was to take on more cargo Sunday morning some twelve hours after her estimated Tacoma arrival time. When collision occurred at 1805 hours, the vessels were less than 13 miles from Astoria. OVERSEAS ALASKA would have picked up at most 15 minutes by overtaking SHINTO MARU and then maintaining full sea speed into Astoria. Even assuming *arguendo* that forbearing to overtake above Astoria would have put SHINTO MARU in the lead once again upon departing Astoria, the vessels would shortly be at sea where such a manuever, if still necessary after the vessels assumed their new courses, could be speedily and safely accomplished. The gaining of a few minutes on the Longview to Astoria leg of the voyage was patently inconsequential given the loading schedule at Tacoma and the proximity of the open sea. It may be that the decision to overtake was motivated by the desire of pilot Pollit to obtain assignment on the first inbound vessel, or it may simply be that personal pride or impatience was the stimulus; but whatever the case the decision was certainly unrelated to the mission or welfare of OVERSEAS ALASKA.

## ANALYSIS

Suction is a well-known and long-recognized hydrodynamic phenomenon that poses a significant potential hazard to vessels engaged in overtaking maneuvers.[7] Several factors have been identified which independently and cumulatively increase its potency and the attendant risk of collision. Aggravating factors include: close proximity of vessels, a disparity in the size of the vessels—especially when the larger vessel is overtaking, high speed on the part of the overtaking vessel, high *relative* speed as between vessels, and navigation through shallow or confined waters.[8] When, due to

6. John Paulling, professor of naval architecture at the University of California who is eminently qualified to give expert testimony on the subject of hydrodynamic interaction between vessels, undertook a detailed analysis of the hydrodynamic forces at work during this overtaking. He testified (on behalf of SHINTO MARU) that his study of the operative facts and circumstances herein convinced him that this collision was induced by the "suction effect." He termed it a "text book example." His calculations indicated that the force of suction operating on SHINTO MARU, assuming a full 200 foot separation between vessels, would conservatively be 4 to 5 times greater than her maximum rudder power to resist it. I accept his testimony and opinion as accurate and authoritative.

7. See, e. g., The SIF, 181 F. 412, 416 (E.D.Pa. 1910); The MONTEREY, 171 F. 442, 449 (S.D. N.Y.1909); The MESABA, 111 F. 215, 227 (S.D. N.Y.1901); R. Farwell, The Rules of the Nautical Road 279 (3d ed. 1954); W. LaBoyteaux, The Rules of the Road at Sea 157 (1920); J. Griffin, Collision § 257 (1949); A. Knight, Modern Seamanship 413 (14th ed. 1966). While the suction effect is also evidenced in meeting situations as vessels pass, its influence is much attenuated. See The AUREOLE, 113 F. 224, 230 (3d Cir. 1902).

8. See R. Farwell, *supra* note 7, at 279 [and cases cited therein]; W. LaBoyteaux, *supra* note 7, at 157–60 [and cases cited therein]; J. Griffin, *supra* note 7 [and cases cited therein]; A. Knight, *supra* note 7. Professor Paulling testified that the term "shallow" was a relative one dependent upon vessel size and vessel clearance *during the overtaking.* The Columbia was shallow in this relative sense which did serve to increase the suction force between vessels. Furthermore, Paulling testified that a

the presence of one or more of the above factors, a substantial suction force is set up, it is ordinarily the overtaken vessel which is overcome.[9] Also, when a disparity in size exists, it is typically the smaller vessel which yields to the force.[10] The collision at bar conformed to this normal pattern.

■■■ It is now firmly established that an overtaking vessel assumes those risks inherent in the maneuver, and, should collision occur, such overtaking vessel shall accordingly bear the responsibility therefor absent proof of fault on the part of the overtaken vessel.[11] OVERSEAS ALASKA, while conceding this to be the general rule, takes two lines of attack to defeat liability. First, it is argued that suction was not an "inherent" risk of passing under the particular circumstances of this case. OVERSEAS ALASKA would limit the risks assumed by the overtaking vessel to just those specific perils which could, at the time of the maneuver, be reasonably foreseen or anticipated. Thus excluded are risks which might attend the maneuver in theory only. This suggested interpretation seems to inject a negligence standard, or something closely akin thereto, into the rule enunciated above. Such a requirement has not been heretofore plainly articulated in cases and

commentaries addressing the subject, and its omission is more likely due to conscious design than to poor draftsmanship.[12] Nevertheless I do not pass on this nice interpretive question inasmuch as its resolution would have no influence on disposition here. I find suction to have been an inherent and foreseeable risk associated with the overtaking at the time and under the circumstances in question. The likelihood of a significant hydrodynamic interaction should have been apparent to OVERSEAS ALASKA prior to commencement of the passing upon due consideration of known or observable vessel characteristics, the high speed of OVERSEAS ALASKA, the substantially slower speed of SHINTO MARU, the character of the channel and the contemplated passing clearance.

■■■ Second, OVERSEAS ALASKA contends that the casualty resulted from faulty navigation . by SHINTO MARU, pointing specifically to the latter's 20° port rudder preceding her sudden sheer into OVERSEAS ALASKA. Such steering order, argues OVERSEAS ALASKA, initiated the swing of SHINTO MARU's bow toward OVERSEAS ALASKA thus bringing it within the influence of a suction force at some lesser distance than the original

transition from deeper to shallower waters enhances the suction force.

**9.** See The HENRY W. OLIVER, 202 F. 306, 309–10 (N.D.Ohio 1912).

**10.** See Northern Nav. Co. v. Minnesota Atlantic Transit Co., 49 F.2d 203, 206 (8th Cir. 1931); J. Griffin, supra note 7, at 586 [and cases cited therein].

**11.** Northern Nav. Co. v. Minnesota Atlantic Transit Co., 49 F.2d 203, 206 (8th Cir. 1931); The AUREOLE, 113 F. 224, 232 (3d Cir. 1902); The SIF, 181 F. 412, 415 (E.D.Pa.1910); The MESABA, 111 F. 215, 223 (S.D.N.Y.1901); J. Griffin, supra note 7, at § 61 [and cases cited therein]; and see Warner Co. v. Independent Pier Co., 278 U.S. 85, 89–91, 49 S.Ct. 45, 73 L.Ed. 195 (1928). It would, however, seem appropriate to apportion damages according to degree of culpability where mutual fault is present within the rationale of United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). Whether a showing of "inevitable accident" would be effective to avoid the imposition of liability in a suction

case need not be addressed herein as I find this collision not to be an "inevitable accident" as that concept has been developed. See J. Griffin, supra note 7, at §§ 236–41 [and cases cited therein].

**12.** While references in OVERSEAS ALASKA's post-trial legal memorandum to principles underlying the defense of inevitable accident do, in isolation, leave the impression that specific fault must be established to impose liability in collision cases, it is nonetheless far from clear that these same principles and the cases setting them forth control with respect to collision incident to overtaking—especially a suction-caused collision. Rules governing vessel duties and privileges in overtaking situations have developed in a somewhat sui generis fashion, and it is not inconceivable that liability without proof of fault might attach in a given case—at least where fault is not shown to rest with some third party or agency. Compare J. Griffin, supra note 7, at §§ 236–41 with J. Griffin, supra note 7, at § 257 and J. Griffin, supra note 7, at § 61.

separation. OVERSEAS ALASKA fortifies this theory of fault by invoking the presumption of fault which attaches to a vessel that suddenly sheers into collision while under no apparent compulsion or stress of circumstances.[13] To overcome the presumption SHINTO MARU must affirmatively demonstrate that the sheer was due to inevitable accident, a "vis major" or other cause not impugning the skill or prudence of her navigation.[14] SHINTO MARU has successfully rebutted the presumption of fault by establishing the following: (1) the sheer force which impelled her toward OVERSEAS ALASKA found its source in hydrodynamic forces of interaction operating over the full distance separating the vessels; (2) the aforementioned 20° port rudder in no significant way contributed to the sheer or the ensuing collision; and (3) SHINTO MARU was properly and prudently navigated throughout the overtaking episode.[15] Thus, both lines of attack taken by OVERSEAS ALASKA to exonerate herself fail.

■ One remaining issue is whether SHINTO MARU should be held jointly at fault with OVERSEAS ALASKA simply for assenting to the overtaking. OVERSEAS ALASKA maintains that the risks involved—notably suction—were equally apparent to both vessels and that, therefore, any fault involved should be deemed mutual. This proposition is neither factually nor legally accurate. The Supreme Court in *Warner Co. v. Independent Pier Co.*[16] delineated the duties of the overtaken vessel thusly:

At most the [overtaken vessel] obligated herself to hold her course and speed so far as practicable, to do nothing to thwart the overtaking vessel, and that she knew of no circumstances not open to the observation of the [overtaking vessel] which would prevent the latter from going safely by, if prudently navigated.[17]

SHINTO MARU, the overtaken vessel herein, fully discharged this obligation. The overtaken vessel additionally has a statutory duty to signal danger by means of "several short and rapid blasts of the steam whistle" if she "does not think it safe for the vessel astern to attempt to pass at that point."[18] I find no breach of said duty by SHINTO MARU. The duty to warn is incumbent upon the overtaken vessel *only* when she "thinks" it unsafe to pass. This implies the existence of a conscious awareness of peril or danger which I find to have been totally lacking on the part of SHINTO MARU.[19] SHINTO MARU cannot be faulted merely for her passive cooperation in the maneuver.

■ As between vessels, OVERSEAS ALASKA had superior knowledge of or control over certain factors critical to an intelligent assessment of the suction risk. Her considerable dimensions and displacement were known to those operating her, her rate of advance was of course within the control of her operators; and, most significantly, the amount of passing clearance was theirs to choose limited only by the physical width of the navigable channel. The overtaking vessel has an affirmative

---

13. *Minnesota S.S. Co. v. LeHigh Valley Transportation Co.*, 129 F. 22 (6th Cir. 1904); *The AUSTRALIA*, 120 F. 220 (6th Cir. 1903); and see J. Griffin, Collision § 258 (1949) [and cases cited therein].

14. *See, e. g., The AUSTRALIA*, 120 F. 220, 222–23 (6th Cir. 1903).

15. *See The FONTANA*, 119 F. 853 (6th Cir. 1903). SHINTO MARU took all reasonable and appropriate measures to break the sheer. She was simply overpowered by it. *Warner Co. v. Independent Pier Co.*, 278 U.S. 85, 49 S.Ct. 45, 73 L.Ed. 195 (1928) requires the overtaken vessel "to hold her course and speed so far as practicable, to do nothing to thwart the overtaking vessel . . . ." I find that SHINTO MARU did properly endeavor, as she was able, to maintain her course and speed and, therefore, discharged said responsibility.

16. 278 U.S. 85, 49 S.Ct. 45, 73 L.Ed. 195 (1928).

17. *Id.* at 89, 49 S.Ct. at 45.

18. 33 U.S.C. § 203, Rule VIII [Article 18, Rule VII of the Inland Rules].

19. *See The VARANGER*, 50 F.2d 724, 726–27 (4th Cir. 1931).

duty to moderate its velocity[20] and keep sufficiently clear of the overtaken vessel so as to avoid dangerous suction.[21] In view of the great size of OVERSEAS ALASKA, the substantially smaller size of SHINTO MARU and the shallowness of the channel, OVERSEAS ALASKA's passing speed was immoderate and her lateral clearance insufficient and imprudent.[22] Needless to say, OVERSEAS ALASKA's responsibility was to forego overtaking altogether rather than attempt it under perilous circumstances.

Accordingly, and consistent with the foregoing, OVERSEAS ALASKA is liable for all damage sustained by SHINTO MARU proximately resulting from the collision here at issue, and additionally shall indemnify Tokyo Marine & Fire Insurance Company for its contribution in general average necessitated by the collision. Counsel for SHINTO MARU shall forthwith prepare and submit an interlocutory decree in conformance herewith. If the parties are unable to agree upon damages within 30 days from the date hereof, or such extension thereof as the Court may grant, a Special Master will be appointed for the purpose of so determining. The foregoing shall constitute the Court's findings of fact and conclusions of law in both cases pursuant to Fed. R.Civ.P. 52(a).

**20.** *The POTOMAC,* 70 App.D.C. 215, 105 F.2d 94, 95 (1939).

**21.** *The POTOMAC,* 70 App.D.C. 215, 105 F.2d 94, 95 (1939); *The FONTANA,* 119 F. 853, 856 (6th Cir. 1903); R. Farwell, *supra* note 7; W. LaBoyteaux, *supra* note 7; J. Griffin, *supra* note 7, at 587. Collisions due to suction operating over distances of 150 to 200 feet and involving much smaller vessels than those herein implicated have been adjudicated. *See Harbor Towing Corp. v. S.S. CALMAR,* 364 F.Supp. 804, 806 (D.Md.1973); *The LEHIGH,* 180 F. 906 (S.D.N.Y.1910); *The CITY OF BROCKTON,* 37 F. 897 (E.D.N.Y.1889); and *see also* discussion in J. Griffin, *supra* note 7, at 588. While it may be true that a pilot, master or other navigator is not chargeable with an understanding of the theoretical physics necessary to fully analyze and quantify the forces of interaction during a particular maneuver, he is nonetheless chargeable with and responsible to acquire a sufficient practical understanding of the phenomenon to navigate prudently.

**22.** OVERSEAS ALASKA relies on certain statements in a work entitled *Port Approach Design—A Survey of Ship Behaviour Studies* by the British National Ports Council to prove that the vessel clearance during the passing was prudent and ample. Portions of this work were read into evidence subject to objection during the cross-examination of Professor Paulling. I now hold that evidence inadmissible by reason of its proponent's failure to establish it as a reliable authority, the requirement of Rule 803(18), Federal Rules of Evidence. However, even were it admissible and given the full weight and credence to which it was due, it would not alter my decision herein. The proffered excerpts were ambiguous, not subject to cross-examination, and, if interpreted in the manner urged by OVERSEAS ALASKA, contrary to the great weight of case law, commentary and scientific study. *See* note 21, *supra*; and the testimony of John Paulling.